**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gilbert Max FEDERBUSH and Alain G.
F. Quilici, Defendants-Appellants.**

Nos. 78–3140, 78–3715.

United States Court of Appeals,
Ninth Circuit.

Submitted July 16, 1980.

Decided July 23, 1980.

Rehearing Denied Aug. 27, 1980.

Port, District Judge, sitting by designa-
tion, concurred and filed opinion.

Jay Goldberg, New York City, Jerrold M. Ladar, Stephen Sommerhalter, San Francisco, Cal., on brief, for defendants-appellants.

Cedric C. Chao, Asst. U. S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before DUNIWAY and ELY, Circuit Judges, and PORT,* District Judge.

DUNIWAY, Circuit Judge:

Gilbert Max Federbush and Alain Quilici were indicted in six counts charging both of them with mail and wire fraud, violations of 18 U.S.C. §§ 1341 and 1343. Each was convicted on all counts and given concurrent sentences, and each appeals. We affirm.

## I. *The Facts.*

We state the facts in the light most favorable to the government, *Glasser v. United States*, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680. We state them in some detail because Quilici, but not Federbush, argues that the evidence is not sufficient to sustain his conviction, and that even if it is, reversible error was committed in permitting the government to prove certain acts similar to those charged in the indictment, when, so far as appears, they were done by Federbush, without direct participation by Quilici. We keep in mind the rule that "a common purpose and plan may be inferred from 'a development and collation of circumstances,'" *Glasser, supra*, 315 U.S. at 80, 62 S.Ct. at 469.

In a nine paragraph preamble, incorporated by reference in each count, the indictment charges the defendants with a scheme to defraud. It consisted of acquiring the Windward Bank (actually Windward International Bank Limited) of Kingstown, St. Vincent, West Indies, representing that it was a real bank, when it was but a shell with no assets, persuading Columbus Associates, Inc., of Massachusetts, to put its funds in a Boston bank account in the name of the Windward Bank, transferring Columbus' assets abroad, and paying Columbus' obligations with Windward Bank checks, which were worthless and would be dishonored. Further, the scheme included advising payees of the Windward checks that they were good and would be honored. In

---

* The Honorable Edmund Port, Senior United States District Judge for the Northern District of New York, sitting by designation.

furtherance of the scheme, the mails and interstate communication facilities were to be used. The specific charges were the sending, by mail, of Windward checks to San Francisco, one to California Coastal Tours for $19,324.87, (Count One), and two to Holiday Inn for $11,945.07 total, (Count Five), and three telephone calls by Federbush in Boston to Irene D. Vasques of California Tours in San Francisco (Counts Two, Three, and Four) and one such call to Barbara Smith of Holiday Inn in San Francisco (Count Six).

All of the foregoing charges were fully proved. A charter for the Windward Bank had been issued to one Hammond, who did nothing with it until he sold it to one Donahugh in June of 1977. At that time it was a "shell," with no assets. However, Federbush and Quilici had some connection with it before that time. A Government of St. Vincent "Certificate of Registration for International Companies" dated 18th April, 1977, a part of defendants' exhibit 1, shows Gilbert M. Federbush as Director and Chairman and Alain G. Quilici as Director of Windward Bank. On August 10, 1977, Donahugh completed a sale of the "bank" to Federbush.

In June or July of 1977, Federbush, representing himself to be an investor in Windward Bank, and one possessing authority to enter into a correspondent relationship on behalf of Windward Bank, attempted, by a phone call to Vice-President Rykert of Central National Bank in Miami, Florida, to establish such a relationship with that bank. Suspecting a fraud, Central National did not enter the proposed relationship.

In July of 1977, Federbush and Quilici, representing themselves to be president and secretary-treasurer, respectively, of Windward Bank, visited the Bradford Trust Company in Boston attempting to establish a correspondent relationship with that bank. Bradford Trust permitted Windward to open an account, but under severe restrictions. Windward could not draw on the account by check or wire. When Windward wished to draw, Bradford first assured itself that checks deposited in the account had actually cleared, and then issued its own Treasurer's Check for the amount to be withdrawn. Most of the checks were delivered to Quilici, some to Federbush. This was not a normal correspondent account or relationship.

During July and August, 1977, several papers purporting to be cashier's checks of Windward Bank appeared in Los Angeles. Two, for $3,000 and $5,000, were deposited in Security Pacific National Bank in July. The Bank was unable to collect on them. One, dated August 24, was forwarded by Bank of America for collection. It was not honored. One, for $6,500, dated July 28, was forwarded for collection by City National Bank, Los Angeles. It was not honored. During City Bank's efforts to obtain payment, Federbush told Warkentine, of City Bank, on August 19, by telephone, that the Windward Bank was in the process of establishing a correspondent relationship with Central National Bank in Miami. One was forwarded for Collection by Union Bank, Los Angeles, in August. It was not honored. All but two of these checks were signed by Federbush. Two purported to be signed by Quilici. It was stipulated that a handwriting expert of the FBI examined them and was unable to reach any conclusive results, one way or the other. There is no other evidence as to the authenticity of these signatures. Another check dated August 2, was deposited in Wells Fargo Bank, Los Angeles. The Bank was unable to collect. The check was signed "Alain Quillici." The foregoing stipulation applies to this signature, also. None of the banks had any other contact with Quilici.

All of the evidence about these Los Angeles checks came in over Quilici's objection, and under a limiting instruction, that it was admitted "for the purposes that prove motive, opportunity, intent, plan, knowledge or absence of mistake or accident, or other innocent reason . . . for those purposes only." Over the objection of counsel for Quilici, the evidence was received against both defendants. The judge declined to limit it to Federbush.

On August 19, 1977, Columbus Associates, a travel agency in Dorchester, Mass., was purchased by one Arthur DeSaulniers, for $175,000. Part of the payment was made with a check drawn on the Windward Bank. Shortly after August 26, Columbus' two bank accounts with the Shawmut Bank were closed, and the balance in each was deposited in the Windward Bank's Account in the Bradford Trust in Boston. Thereafter all of Columbus' receipts were deposited in that account. At the same time, an "account" in its name was opened at Windward Bank. Columbus had a separate payroll account in a Massachusetts bank, which was replenished from time to time by means of Bradford Trust Treasurer's Checks, from the Windward account at Bradford. Quilici or Federbush would hand cash to Barnes, of Columbus, to replenish the payroll account. Columbus issued checks drawn on the Windward Bank to pay its other obligations. During the week of August 26, and thereafter, Federbush and Quilici were often in the office of Columbus Associates, meeting with DeSaulniers. They were "the bankers." Beginning three or four weeks after August 26, Columbus Associates got numerous calls from creditors who were unable to obtain payment of the checks drawn on the Windward Bank. Of over 300 such checks, only two were honored. Eventually, Columbus Associates went bankrupt.

Meanwhile, in early September, Federbush and Quilici arrived at the office of Rykert of Central National Bank in Miami to talk further about establishing a correspondent relationship. Rykert said he would need financial information. Quilici, who was taking notes, promised to furnish the information, but never did.

Bradford Trust, in Boston, never got the information it wanted; so it closed the Windward Bank account in late September. Thereupon a new account in the name of the Windward Bank (an ordinary commercial account, not a correspondent account) was opened at City Bank and Trust Company, in Boston, on September 28. The then balance in the Bradford Trust account was put in the City Bank account, and all further receipts of Columbus Associates went into the new account. Federbush and Quilici met with Doty, of City Bank, at that bank, on September 28, to open the account. The account was closed on October 31, by City Bank. There were only three withdrawals from the account, one payable to the telephone company, one ($25,000) to Shawmut Bank, and one, to Windward Bank, of $92,348.80. City Bank closed the account because it could not find out what Windward Bank really was.

Columbus Associates had regularly arranged tours with California Coastal Tours and the Holiday Inn, both of San Francisco, and had enjoyed satisfactory business relations with each. When Columbus changed its banking arrangements, the two California businesses began having difficulty in obtaining payment of checks drawn on Windward Bank. These difficulties formed the basis for the six counts of the indictment against Quilici and Federbush. Each of the counts involved either a phone call by Federbush involving his promise on behalf of Windward Bank to cover the obligations of Columbus or the mailing of a Windward Bank check to either California Coastal Tours or Holiday Inn.

The Windward International Bank Limited was what Mr. Rykert of Central National Bank in Miami called a "fraud," a "bustout," a "scam or flimflam," like "the Bank of Sark."

A. The Bank of Sark was an offshore bank set up in the Channel Islands that issued certificates of deposit and cashier's checks. People paid money for the deposits and cashier's checks, and when they were sent back to the bank for collection, it was a post office box.

Q. And the checks were not honored?

A. Correct.

The Windward Bank was a charter and Messrs. Federbush and Quilici, and nothing more. It had no capital, no surplus, no reserves, no assets. For every dollar it received in its Boston accounts from Columbus Associates, it owed a dollar to Colum-

bus. The net worth of Windward was not increased one cent by those deposits. It was always insolvent. From such records as it had, an FBI accounting expert reconstructed its condition during July–October 1977 as follows:

|  | Deposits | Checks Drawn Against Windward Bank |
|---|---|---|
| July 1977 | $ –0– | $ 53,912.57 |
| August 1977 | $ 6,321.08 | $162,210.78 |
| September 1977 | $169,244.36 | $372,586.26 |
| October 1977 | $ 18,602.52 | $ 73,338.34 |
| TOTALS | $194,167.96 | $662,047.95 |

Neither Federbush nor Quilici ever deposited any money in Windward. Yet they both wrote checks on their "accounts" with it, in substantial amounts, during the period in question. It had no office. Its Kingstown, St. Vincent "office" and telephone were those of a lawyer, designated as its resident agent, who always referred callers to Federbush. Its Boston and New York "offices" were telephone answering services. Its records, such as they were, were in Federbush's and Quilici's briefcases. It was, as the government argues, a sham, a vehicle to defraud, to obtain money by false pretenses. That is what Federbush and Quilici used it for.

In October, 1977, DeSaulniers told California Coastal Tours that he and Federbush were coming to San Francisco to resolve the existing non payment problems. After ascertaining that the Windward Bank cashier's check that it had previously been given had not yet been honored, Coastal Tours notified the FBI and the police of Federbush's impending arrival. On October 13, 1977, Federbush was arrested at the Coastal Tours office. A briefcase in his possession containing Windward Bank records was seized. Quilici was arrested on the same date in his San Francisco hotel room. A briefcase in Quilici's possession containing Windward Bank records was also seized. Following the arrests, the FBI obtained a warrant to search the briefcases and the hotel rooms of Federbush and Quilici for evidence relating to their check writing activities on the Windward Bank.

## II. *Validity of Search Warrants.*

The defendants moved to suppress evidence obtained under search warrants authorizing search of their San Francisco hotel rooms and their briefcases. The motions were denied, and defendants claim error.

### A. *Sufficiency of Description of Property to be Seized.*

■ Defendants argue that the warrants' descriptions of things to be seized were unduly vague and thus improperly left the determination of what should be seized to the discretion of the executing officers. In addition, they claim that the warrants did not allow seizure of some items seized under their authority.

The property to be seized was described in the warrants as:

documents, securities, papers, and all mechanical instruments such as check protectors and specialized writing devices associated with issuing such documents, pertaining to the Windward International Bank, Ltd., of Kingston, [sic] St. Vincent, and are being held in violation of United States Code, Title 18, Section 2314.

In *Andresen v. Maryland*, 1976, 427 U.S. 463, 479–482, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 the Court upheld a warrant similar in language to that used here, which, in addition to authorizing the seizure of specific papers in a real estate fraud case, also authorized the seizure of "other fruits, instrumentalities and evidence of crime at this [time] unknown." *Id.* at 479, 96 S.Ct. at 2748. The search warrants involved here specified the crime and the enterprise to which the items listed were to pertain, but did not include such potentially general language. The trial court correctly rejected the attack on the warrants' description of property to be seized.

■ Defendants also argue that the warrants limit the items to be seized to those held "in violation of" 18 U.S.C. § 2314, which precluded the seizure of "mere evidence" of the commission of the crime. We reject this hypertechnical reading of the warrant. Its language is to be interpreted in a common sense and realistic fashion,

*United States v. Ventresca*, 1965, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684. Therefore, we read the language to include items held in connection with violation of § 2314. *See* F.R.Crim.P. 41(b).

### B. *Sufficiency of Affidavits.*

Defendants claim that the affidavits supporting the warrants did not state facts sufficient to establish probable cause to believe either that the specified crime [1] had been committed or that the items described in the warrant would be found in the places to be searched, two briefcases and two hotel rooms. They also claim that the trial court erred by failing to hold an evidentiary hearing into this claim and their claim that the affidavits contained material misstatements of fact. We reject all of these claims.

■ The affidavits were sufficient to provide the magistrate with probable cause to believe that a violation of § 2314 had been committed. The theory of the affiants was that Windward Bank itself did not exist. The affiants showed ample reason to believe that it did not. Thus, this case would not come within the exception of § 2314 for "any promise to pay . . . issued by . . . a bank . . . of any foreign country." Under this theory, the checks of Windward Bank could accurately be considered "falsely made" within the third paragraph of § 2314. Furthermore, the affidavits are sufficient to permit the magistrate to find probable cause to believe that the second paragraph of § 2314, which requires interstate transportation of a person, rather than a check, had been violated. *See United States v. Reina*, 9 Cir., 1971, 446 F.2d 16. The affidavits described the fraudulent scheme—checks drawn on what appeared to be a nonexistent bank and payees unable to collect—and described the travel of DeSaulniers with Federbush and Quilici from Boston to San Francisco in connection with the scheme. This is a more than adequate factual basis on which the magistrate could determine that a violation of § 2314 had been committed. The affida-

vits also made a sufficient showing that it would be reasonable to seek the evidence in the briefcases and hotel rooms. *United States v. Hendershot*, 9 Cir., 1980, 614 F.2d 648, 654.

■ Nor did the trial court err in denying defendants' motion for a hearing concerning the alleged falsity of the supporting affidavits.

> There is . . . a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory . . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth and those allegations must be accompanied by an offer of proof.

*Franks v. Delaware*, 1978, 438 U.S. 154, 171, 98 S.Ct. 2674, 2685, 57 L.Ed.2d 667. A hearing is required only if a preliminary showing is made that the warrant is invalid under *Franks* and that the challenged material is necessary to a finding of probable cause. *United States v. Young Buffalo*, 9 Cir., 1979, 591 F.2d 506, 510. No such showing was made. The statements of a victim-witness to a crime need not be independently corroborated. *United States v. Mahler*, 9 Cir., 1971, 442 F.2d 1172, 1174–1175. The affidavits were sufficient.

### III. *Motion for a Bill of Particulars.*

■ The grant or denial of a bill of particulars is a matter of discretion for the trial judge. *Wong Tai v. United States*, 1927, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545. The superseding indictment was sufficiently detailed to tell the defendants the essential facts of the crimes with which they were charged and thus to obviate the need for a bill of particulars. *United States v. Chenaur*, 9 Cir., 1977, 552 F.2d 294, 302. It was not an error to deny the motion for a bill of particulars.

---

1. The warrants were based on a violation of 18 U.S.C. § 2314, interstate transportation of

forged securities or of a person in order to further a fraudulent scheme.

## IV. *Refusal of Jury Instructions.*

Defendants say that the trial court erred in refusing to accept two proposed jury instructions submitted by Quilici's attorney just before closing argument. The judge explained that he was rejecting the instructions because they were not submitted in accordance with the Local Rules for the Northern District of California. It is evident from the record that he was referring to Rule 245–3, West's Cal. Rules of Court, 1980, p. 517. The instructions proposed were handwritten and not complete. They were not presented in the form required by Local Rule 120–1, *Id.* at 508. Nor were they properly filed with the Clerk of the Court according to Local Rule 235–9(b), *Id.* at 516. The trial judge did not abuse his discretion. *See United States v. Lustig,* 9 Cir., 1977, 555 F.2d 737, 751.

## V. *Denial of Quilici's Motion for Judgment of Acquittal.*

Quilici argues that the proof at trial was insufficient to sustain a jury verdict against him, so that the trial court erred in refusing to grant his Rule 29 motion for a judgment of acquittal. As our statement of the facts shows, there was substantial evidence from which a jury could rationally conclude beyond a reasonable doubt that Quilici was guilty as charged. *United States v. Nelson,* 9 Cir., 1969, 419 F.2d 1237, 1242, 1245. *See also United States v. Rich,* 9 Cir., 1978, 580 F.2d 929, 934. Quilici was in the "scam" with Federbush from the beginning, and stayed with it to the end, as an active participant.

## VI. *Admission of "other acts" against Quilici.*

Quilici argues that it was error to admit against him the evidence about the Los Angeles checks that we have described in our statement of the facts. He argues that all of the Los Angeles events occurred before he became a director of the bank. In this, he is plainly wrong. As we have seen, he was listed as a director in April, 1977. He represented himself to the Bradford Trust to be secretary-treasurer of the Windward Bank in July of 1977. The Los Angeles checks began showing up in late July and several appeared in August. At least three of them could be found by the jury to be signed by Quilici. Some of the Los Angeles checks were issued at just the time when DeSaulniers was buying Columbus Associates and using a Windward check to pay part of the price.

We conclude that it was proper to permit the jury to consider the evidence about the Los Angeles checks in determining Quilici's "motive, opportunity, intent, plan, knowledge or absence of mistake or accident, or other innocent intent." What happened with the Los Angeles checks is so similar to, and so closely contemporaneous with, the scheme charged in the indictment as to permit a jury to find that the Los Angeles checks were a part of a scheme concocted and carried out by Federbush and Quilici together.

Whether to admit such evidence is left to the sound discretion of the trial court. *United States v. McDonald,* 9 Cir., 1978, 576 F.2d 1350, 1356. The fact that most of the Los Angeles evidence related to Federbush does not make it inadmissible against Quilici. As the court said in *United States v. Amrep Corp.,* 2 Cir., 1977, 560 F.2d 539, 545:

> The admissibility of evidence in a mail fraud scheme involving two or more persons is determined similarly to that in a conspiracy. "The acts and declarations of each party to the scheme made in furtherance or execution thereof are admissible against all." *United States v. Grow,* 394 F.2d 182, 203 (4th Cir.), *cert. denied,* 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968); *United States v. Cohen,* 516 F.2d 1358, 1364 (8th Cir. 1975); *United States v. Cohen,* 145 F.2d 82, 90 (2d Cir. 1944), *cert. denied,* 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945). So long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had

agreed. *United States v. Epstein*, 154 F.2d 806, 809 (2d Cir.), *cert. denied*, 328 U.S. 858, 66 S.Ct. 1350, 90 L.Ed. 1629 (1946); *United States v. Cohen, supra*, 145 F.2d at 90.

We made a similar statement of the law, citing some of the same cases, in *United States v. Outpost Development Company*, 9 Cir., 1977, 552 F.2d 868, 870. *See also United States v. Weidman*, 7 Cir., 1978, 572 F.2d 1199, 1201–1202. The court properly admitted the evidence concerning the Los Angeles checks, under the limiting instruction that we have quoted.

## VII. *Claimed Errors in Instructions.*

### A.

■ Quilici argues that the court should have told the jury that the Los Angeles events were to be considered only as evidence against Federbush, and could not be considered as against Quilici. What we have said about the admissibility of this evidence disposes of this argument. The trial court's instruction to the jury [2] was almost identical with the instruction given in *United States v. Outpost Development Co., supra*, 552 F.2d at 870. There, we criticized the instruction because "a common plan to commit an unlawful act is not necessarily a scheme to defraud" (*Id.*). However, we also pointed out:

> Furthermore, the only evidence of a common plan introduced at the trial was evidence of the fraudulent scheme. Because the only evidence of a common plan was evidence of the fraudulent scheme, the instruction, even if not wholly correct as a matter of law, could not have prejudiced the defendants.

*Id.* at 870–871.

That is also the situation in this case. Moreover, the court more than once told the jury that it could only consider "an alleged earlier offense of a like nature" if it had found, beyond a reasonable doubt, from the other evidence in the case, that the accused did the act charged in the indictment. We find no error.

### B.

■ The court refused an instruction that the Windward Bank could stop payment on its cashier's checks. It gave no instruction on the question. The defendants claim error. The issue is a red herring, dragged across the defendants' trail by Federbush in his testimony. As we have seen, the "bank" was always insolvent, ultimately to the tune of some $660,000.00. Even if, as Federbush said, it had stopped payment on $200,000.00 of the bad checks with which it was papering the country, it still would have been insolvent, and its checks would have been, as they in fact were, dishonored. Equally a red herring, in the light of what the defendants did, is their claim that they were offering Columbus the benefit of what they call the "extended disbursement float," and that all would have worked out for the best if only they had been let alone. Columbus was afloat when defendants boarded it, but thanks to them, it promptly sank.

### C.

■ The defendants criticize the court's instruction on intent, saying that it is a direction to convict. We quote the instruction in the margin.[3] The defendants

2. The trial judge instructed the jury:

> When two or more persons knowingly associate themselves together to carry out a common plan or arrangement, with the intent either to accomplish some unlawful purpose, or to accomplish some lawful purpose by unlawful means, there arises from the very act of knowingly associating themselves together with such intent, a kind of partnership in which each member becomes the agent of every other member.
>
> So where the evidence in the case shows such a common plan or arrangement, evidence as to an act knowingly done or a statement knowingly made by one such person, while the common plan or arrangement is continuing, and in furtherance of some object or purpose thereof, is admissible against all.

3. The defendants in this case are charged with intent to defraud. If the government proves beyond a reasonable doubt that the defendants wrote checks on the Windward International Bank account with the intent that the Windward International Bank would not honor those checks when presented, then you must find that the defendants acted with fraudulent in-

overstate the effect of the instruction. Moreover, we do not view this instruction in a vacuum, but in the light of the entire charge. The court flatly charged that good faith is a complete defense. It emphasized and reemphasized, by our count not less than 15 times, the government's burden to convince the jury beyond a reasonable doubt, as to each element of the offense. We do not consider the court's instruction to be a model, but we do not find reversible error.

■ The court did not give the defendants' proposed instruction on specific intent. It would not have been error to give the instruction, but, in light of the instructions that the court did give, the refusal was not reversible error.

### D.

■ Defendants criticize an instruction reading:

> A statement or representation is "false or fraudulent" within the meaning of this statute, if known to be untrue, or made with reckless indifference as to its truth or falsity, and made or caused to be made with the intent to deceive.

Our decision in *Irwin v. United States*, 9 Cir., 1964, 338 F.2d 770, 774, answers this claim of error. *See also United States v. Love*, 9 Cir., 1976, 535 F.2d 1152, 1157–1158.

### E.

■ Defendants criticize an instruction reading:

> You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

We, too, have criticized such an instruction. *United States v. Eaglin*, 9 Cir., 1977, 571 F.2d 1069, 1076; *Cohen v. United States*, 9 Cir., 1967, 378 F.2d 751, 755. However, in both of those cases we decided, in the light of all of the instructions given, that the jury could not have been misled. We reach the same conclusion here.

The judgments of conviction are affirmed.

PORT, District Judge, concurring.

I concur in all respects with the well reasoned Opinion of Judge Duniway and its analysis of the facts with one exception. I do not think the evidence supports the inference that, "Quilici was in the 'scam' with Federbush from the beginning . . . as an active participant." *Supra* at 253. In spite of the easily met standard of this circuit, I fail to find sufficient independent non-hearsay evidence connecting Quilici to the fraudulent scheme at the time of the issuance of the Los Angeles checks to make Federbush's statements and conduct ("other acts") admissible against Quilici. *See United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978); *United States v. Wood*, 550 F.2d 435 (9th Cir. 1976).

However, the later refusal to strike was not error. Quilici's subsequent conduct in writing personal checks against a non-existent account in the Windward Bank and the tell-tale contents of his briefcase clearly connect him with the fraudulent scheme. When Quilici "joined and actively participated in [the scheme], he adopted the previous acts and declarations of his fellow [schemers]. *United States v. Bucur* (7 Cir., 1952), 194 F.2d 297, 302. These acts became admissible against him, at least as they tended to show the nature and objectives of

---

tent. If the government proves beyond a reasonable doubt that the defendants caused the Windward International Bank to issue cashier's checks and did so with the intent that the Windward International Bank would not honor those checks when presented, then you must find that the defendants acted with fraudulent intent. If the government proves beyond a reasonable doubt that the defendants wrote checks on the Windward International Bank account without a reasonable expectation that sufficient funds would be available at the time the checks were presented for payment, then you must find that the defendants acted with fraudulent intent. If the government proves beyond a reasonable doubt that the defendants caused the Windward International Bank to issue cashier's checks without a reasonable expectation that sufficient funds would be available at the time the cashier's checks were presented for payment then you must find that the defendants acted with fraudulent intent.

the [scheme] he joined." *United States v. Santos*, 385 F.2d 43, 45–46. (7th Cir. 1967), *cert. denied* 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1148.

I concur in affirming the convictions as to both Federbush and Quilici.