**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Martin S. WOLFSON,**
**Defendant–Appellant.**

**No. 80–1234.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 17, 1980.

Decided Dec. 30, 1980.

---

Daniel Markoff, Las Vegas, Nev., for defendant–appellant.

Rimantas A. Rukstele, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff–appellee.

Before DUNIWAY and KENNEDY, Circuit Judges, and CURTIS,* District Judge.

DUNIWAY, Circuit Judge:

Martin S. Wolfson appeals from his conviction of fraud by wire in violation of 18 U.S.C. § 1343 (two counts) and of conspiracy to commit the same acts under 18 U.S.C. § 371 (one count). We affirm his conviction but vacate the sentence imposed by the district court and remand the matter for resentencing.

## I. *The Facts.*

We state the facts in the light most favorable to the government. *Glasser v. United States*, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680.

This is the second case that has come before us involving the use of a bank charter, issued by the government of St. Vincent, West Indies, to deceive people into thinking there is a real bank. *See United States v. Federbush*, 9 Cir., 1980, 625 F.2d 246. In the case at bar, as in *Federbush*, the "bank" can properly be described as a "fraud," a "bustout," a "scam or flimflam," like "the Bank of Sark." *Id.* at 250.

Here, the "bank" carried the impressive name First London Bank and Trust Company. It consisted of a paper charter, one Kevin Krown, who owned the charter, an address in Kingstown which turned out to be a "Pet's Gift Shop," and a telephone number there, manned by a lady named Roseanne. Krown, in New York, had in his possession forms of cashier's checks of the "bank." His business, or that of the "bank," if one prefers, was selling those checks, made out to fictitious persons, for large sums, but sold for much smaller sums, so that the buyer could pass them off on unsuspecting victims at their face value. To assist the buyer, Krown furnished the Kingstown telephone number, and agreed to and did have Roseanne tell anyone who called to inquire that the checks were good.

Wolfson was such a buyer, and his purpose, known to Krown, was to use the checks to defraud the MGM Grand Hotel in Las Vegas, Nevada. The conspiracy was hatched at a meeting in New York City on March 31 or April 1, 1978, between Wolfson, one Nicholas Agostino, Krown, and certain other co–conspirators. There, Wolfson and a co–conspirator named Frank Carbonero agreed to purchase $60,000 in cashier's checks from Krown, for ten percent in cash of the face value of the checks, and also to furnish Krown with a check in the face amount of the cashier's checks. Krown explained that he needed such a check so that "when somebody came to him he [could] say, well, they paid me with a bad check so I don't have to honor this [cashier's] check and I can't honor it anyhow because there isn't no money in the bank."

That afternoon or the next morning a second meeting was held at which Wolfson received eight cashier's checks totalling $60,000. Krown assured Wolfson, in response to Wolfson's questioning, that he had already told "Roseanne" at the "bank" to verify the checks if any inquiry were made.

---

\* The Honorable Jesse W. Curtis, Senior United States District Judge for the Central District of California, sitting by designation.

Wolfson promptly left for Las Vegas to see if the checks might be cashed. His scheme worked beautifully. On April 1, 1978, he deposited one of the cashier's checks for $5,000 with the cashier's cage at the MGM and received cash or gambling credits–i. e., an advance of chips which could be cashed in–of $5,000. On the next day he deposited a second check of $10,000 and received $10,000 in cash or credits. Pleased with these results, Wolfson returned to New York on April 3, 1978, to secure more cashier's checks from Krown.

Shortly after his return, Wolfson, Carbonero, Agostino and Krown had another meeting. Krown agreed to write another $60,000 in cashier's checks on the same terms as before. He wrote out three checks for $20,000 and once again reassured Wolfson that he had told Roseanne at the "bank" to verify the checks upon inquiry.

Wolfson flew back to Las Vegas and checked into the MGM on April 6, 1978. On that day, he presented two cashier's checks to the casino cage, each in the amount of $10,000, and received $20,000 in cash or credit. On the following day, he deposited two more $10,000 cashier's checks again for cash or credit of the same amount. Krown proved true to his word when the hotel sought to verify these four checks. The hotel placed an overseas call on April 7th to the "bank's" number, requesting verification and received an answer on the same day from Roseanne stating that the checks were all good. These four cashier's checks are the basis of Count II of the indictment.

On April 8, 1978, Wolfson deposited with the hotel two more cashier's checks each in the amount of $20,000 and received cash or credit of $40,000. Finally, on the following day he cashed the remaining $20,000 check. On April 10, 1978, the MGM sought to verify the validity of the two checks cashed on April 8. Again Roseanne returned the call and verified the checks. These two checks are the basis of Count III of the indictment.

His mission completed, Wolfson checked out of the hotel the afternoon of the 10th, leaving MGM with $115,000 in worthless cashier's checks.

## II. *The Merits.*

### A. *Evidence of Conspiracy–Count I.*

Wolfson argues that the extensive testimony given by Agostino, an unindicted co-conspirator, should not have been admitted at trial and that without this evidence there was insufficient proof of a conspiracy. One phase of his argument is that a conspiracy cannot be established by the testimony of a co-conspirator–an accomplice. That is not the rule in this circuit. *United States v. Turner*, 9 Cir., 1975, 528 F.2d 143, 160, 161.

The second phase of the argument is that Agostino's testimony about what was said at the meetings by Krown, Carbonero and Wolfson was hearsay, and should not have been admitted until independent evidence of the conspiracy was produced, and that such independent evidence was never produced. However, the hearsay argument is not applicable here. Rule 801(c), F.R. Evid., defines hearsay as "a statement . . . offered in evidence to prove the truth of the matter asserted." But when a witness is present at a meeting between a group of conspirators, and they orally, in his presence, agree upon the conspiracy, its objectives, and its *modus operandi*, the witness' testimony about what each of them said is not hearsay. It is not offered to prove that what the conspirators said is true, but to prove their verbal acts in saying it. This does not violate the hearsay rule. We so held in *United States v. Calaway*, 9 Cir., 1975, 524 F.2d 609, 613. Thus most of Agostino's testimony–and the most important part of it–was not hearsay at all.

The only testimony given by Agostino that did not tell what happened at the meetings relates to what Krown did after Wolfson and Carbonero left the meetings. Agostino saw Krown make up the checks. He also saw and heard Krown place a call to St. Vincent and tell Roseanne to verify the checks if called, and give her a description of the checks. Making up the checks is not a statement, and cannot be hearsay. The conversation with Roseanne was not offered to prove the truth of what Krown said, but to prove that he did what he

agreed to do—made the call and gave the instructions.

The hearsay argument is a false scent which we decline to follow.

B. *Evidence of Wire Fraud—Counts II and III.*

■ Count II charges that Wolfson caused a telephone communication from Las Vegas to Kingstown on or about April 7, 1978. Count III contains a similar charge about the similar call of April 10, 1978.

Wolfson argues that his conduct was not within the ambit of 18 U.S.C. § 1343 because he did not "cause" the use of wire facilities and because even if he did, the phone calls were not in furtherance of the scheme to defraud.

Eighteen U.S.C. § 1343 makes it a crime to "[transmit] or [cause] to be transmitted by means of wire ... any sounds ... for the purpose" of committing fraud. In *Pereira v. United States,* 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435, the Court interpreted a similar provision in the mail fraud statute, 18 U.S.C. § 1341. The Court found that "where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* at 8–9, 74 S.Ct. at 362–363 (citation omitted). This formulation guides us in our interpretation of the wire fraud statute. *See United States v. Louderman,* 9 Cir., 1978, 576 F.2d 1383, 1387 & n.3.

Here, the evidence shows that Wolfson caused the international phone calls placed by MGM to Roseanne on April 7 and April 10, 1978. Wolfson fully expected that the hotel would seek to verify the checks by such means, and it was for this reason that he made sure, before each of his trips to Las Vegas, that Krown had arranged to have Roseanne alerted to verify the checks. To that end, Wolfson provided MGM with a telex and telephone number for Roseanne when he applied for credit.

Wolfson next argues that the calls were made after the scheme was over—after he had received the cash or gambling credits—and thus were not "for the purpose of executing [the] scheme" as required by the statute. He points out that the April 7 call was placed after he had cashed, or at least received credit for, the checks forming the basis of Count II. Similarly, he argues that the April 10 call was placed to verify checks which he had already cashed or received credit for, and which form the basis of Count III. In each instance, Wolfson argues, the fraud had been completed before the call was made and 18 U.S.C. § 1343 has no application to the offense.

This type of question has been much litigated under the mail fraud statute. *See, e. g., United States v. Kelem,* 9 Cir., 1969, 416 F.2d 346. The Supreme Court undertook to clear up some of the confusion in *United States v. Maze,* 1973, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603. In that case the defendant Maze stole a credit card and used it to travel through the "sunny Southland." The Court affirmed the Sixth Circuit's holding that the mailing of invoices from out-of-state motels in which Maze had stayed to the Louisville bank that had issued the credit card did not bring Maze's crime within the mail fraud statute. The Court distinguished its decision in *United States v. Sampson,* 1962, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136: "The subsequent mailings [in *Sampson*] were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place. But the successful completion of the mailings from the motel owners here to the Louisville bank increased the probability that. respondent would be detected and apprehended." 414 U.S. at 403, 94 S.Ct. at 650.

In our case, the phone calls made by MGM to the First London Bank were an integral part of Wolfson's scheme. Wolfson expected the calls and counted on them "to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make [his] apprehension ... less likely." *United States v.*

*Maze, supra,* 414 U.S. at 403, 94 S.Ct. at 650. He said to Krown, "[A]re you going to verify that the checks are good and give me that time to work with?" To which Krown replied, "I always verify checks." We find that on the facts of this case, MGM's phone calls were within the reach of the wire fraud statute.

### C. *Evidence of Fraud.*

■ Wolfson argues that because the cashier's checks were returned to MGM's bank without any indication as to why the checks had not been honored and that because the checks were never actually presented to the First London Bank, it may well be that the checks are still and always were valid and thus that there was never any fraud. But Wolfson virtually concedes that if Agostino's testimony was properly admitted, there was ample evidence that the checks were worthless. That testimony was indeed properly admitted, and we move on to a weightier objection.

### D. *Wolfson's Sentence.*

■ The district judge imposed sentence at a hearing on April 7, 1980. He found Wolfson guilty on all counts and sentenced him to three years in prison for each count, "Counts II and III . . . to run consecutively to Count I." After imposing sentence, the judge told Wolfson about his right to appeal, and set an appeal bond. Then followed a colloquy between Wolfson's counsel and the court:

> MR. MARKOFF: . . . It has been my understanding that recommendations have been made by the U.S. Attorney's office in sentence matters coming before the District Court here. Is that true in this case?

> .    .    .    .    .

> THE COURT: Mr. Markoff, I don't sentence anybody unless I have consulted in some manner or means with members of the United States Attorney's office or prosecuting authority whoever it is. Just as I don't sentence anybody without reading and re-reading the presentence report. . . .

> .    .    .    .    .

> MR. MARKOFF: Sir, if I may respectfully request then what information was brought to your attention from the United States Attorney's office?

> THE COURT: I don't think that's any of your business, Mr. Markoff, I answered your question.

Wolfson's counsel was never shown at the hearing a copy of the U.S. Attorney's sentencing report, a copy of which has been included in the record on appeal. In this ex parte report the government makes note of several factors concerning the case and recommends a sentence of three years for each count of the conviction to be served consecutively. The judgment which was ultimately entered on April 7 imposed just such a sentence:

> THREE (3) YEARS as to count 1; THREE (3) YEARS as to count 2 and THREE (3) YEARS as to count 3.

> IT IS ADJUDGED that the sentence imposed as to count 2 is to run consecutively to the sentence imposed as to count 1; the sentence imposed as to count 3 is to run consecutively to the sentence imposed as to count 2.

Wolfson argues that his sentence must be vacated and we agree.

In *United States v. Perri,* 9 Cir., 1975, 513 F.2d 572, we stated that as a general rule "fundamental fairness to the defendant requires that he and his attorney be told the substance of all derogatory information which adversely affects his interests and which has not otherwise been disclosed in open court." *Id.* at 575. We vacated the sentence in that case because the district judge explicitly relied upon a confidential government report in making his sentencing determination.

■ We hold, in agreement with other circuits that have considered this question, that it is improper for the prosecution to make, or for the court to receive from the prosecution, an ex parte communication bearing on the sentence. *See United States v. Huff,* 5 Cir., 1975, 512 F.2d 66, 71; *United States v. Rosner,* 2 Cir., 1973, 485 F.2d 1213, 1231; *United States v. Solomon,* 7 Cir., 1970, 422 F.2d 1110, 1119–21; *Haller v. Robbins,* 1 Cir., 1969, 409 F.2d 857, 859

1222

("[N]ot only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure. However impartial a prosecutor may mean to be, he is an advocate, accustomed to stating only one side of the case.").

Most defendants in federal criminal cases plead guilty. For them, the sentencing proceedings are probably the most important because they determine what is to happen to the defendant. For the defendants who go to trial and are convicted, the sentencing proceedings are scarcely less important. In either case, it is of the utmost importance not only that justice be done, but that it also appear to be done. A secret communication by the prosecutor, an adversary advocate, to the judge, especially when it is invited by the judge and contains not only factual statements but also a recommendation of what the sentence should be, destroys that appearance. We cannot approve it.

In this case, the record strongly suggests that the court relied upon the prosecutor's ex parte report. The penalty imposed in the judgment was precisely what the prosecutor recommended. Moreover, this was not a case in which it was necessary to withhold the report in order to protect, for example, an ongoing investigation. *See United States v. Dubrofsky*, 9 Cir., 1978, 581 F.2d 208, 214–215.

In *Farrow v. United States*, 9 Cir., 1978, *in banc*, 580 F.2d 1339, the defendant moved, under 28 U.S.C. § 2255, to vacate his sentence because the judge had relied on prior convictions that were invalid under *Gideon v. Wainwright*, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, so that, under *United States v. Tucker*, 1971, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592, it was improper to consider those convictions. We held that "§ 2255 *Tucker* petitions . . . should ordinarily be decided by the original sentencing judge." *Id.* at 1351. We followed this holding in *Gelfuso v. Bell*, 9 Cir., 1978, 590 F.2d 754, 755, in which the defendants claimed, in a § 2255 motion, that they had been sentenced on the basis of assumptions concerning their criminal records which

were not true, citing *Townsend v. Burke*, 1948, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690. In *United States v. Fernandez*, 9 Cir., 1979, 589 F.2d 977, 979, we had remanded for a hearing on whether the presentence report was prepared by a biased probation officer. The judge had a new report prepared by a different probation officer, and reimposed the same sentence. Citing *Farrow*, we affirmed.

Those cases are not controlling here. They do not involve a secret report and recommendation by the prosecutor to the judge. Accordingly, we vacate the sentence and remand the case for resentencing. To preserve the appearance of justice, *United States v. Arnett*, 9 Cir., 1979, 628 F.2d 1162, 1165, we direct that the resentencing shall be by another judge, as was done in *Huff* and *Rosner, supra.*

The convictions are affirmed. The sentence is vacated and the case is remanded for resentencing in conformity with this opinion.