59 F.3d 176
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Kay ADAMSON; Robert Don Adamson, Defendants-Appellants.
 Nos. 94-30195, 94-30196.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 7, 1995.
Decided June 12, 1995.
 
 Before: BROWNING, BOOCHEVER, and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Robert Don Adamson and Robert Kay Adamson, father and son, were involved in a "debt elimination program" which they promoted at seminars around the country in 1987 and 1988. Participants in the program purchased "sight" or "certified" drafts resembling certified bank checks for up to fifteen percent of their face value, and then used the drafts to pay off debts. The participants paid in cash or cashier's checks, and also paid extra processing and paperwork fees. The Adamsons received as a commission one third of the money made from the sale of the drafts. The Adamsons also attempted to pay off their own debts with the drafts.
 
 
 3
 The drafts were purportedly drawn on four financial institutions, all of which shared a post box address in Acapulco, Mexico. The post office box was a remail service set up by Happy Dutton, Robert Don's informally-adopted daughter, who also participated in the seminars.
 
 
 4
 The financial institutions did not exist and the drafts were worthless. When creditor banks attempted to redeem the drafts that they had received in satisfaction of debts, the banks were unable to collect.
 
 
 5
 Robert Kay was convicted of three counts of mail fraud and two counts of bank fraud. Robert Don was convicted of two counts of bank fraud. Other Adamson family members were acquitted.
 
 
 6
 I. Failure to record portions of videotapes played at trial
 
 
 7
 Videotapes of seminars and meetings were admitted in their entirety into evidence at trial, with no objection by the Adamsons. The prosecution played portions of the videotapes, which do not appear transcribed in the trial transcripts.
 
 
 8
 At the close of the evidence, the Adamsons objected to the videotapes being taken into the jury room, because the jury had not viewed all of the tapes. The judge sustained the objection, providing that the viewed portions of the tapes would be kept in the courtroom and replayed to the jury if it so requested.
 
 
 9
 The Adamsons now claim that because 1) only portions of the videotapes were played, 2) the prosecution did not make a record of which portions were played, and 3) the jury did not take the tapes into the jury room, this court cannot be sure what portions of the videotapes were taken into consideration by the jury. The Adamsons argue that this court on appeal is thus precluded from examining the entire record, and so cannot consider the taped evidence in evaluating the sufficiency of the evidence, or in evaluating the harm done by the admission of the tapes.
 
 
 10
 The Adamsons complain that the prosecutor failed to make a record of the portions of the tapes played at trial. It is not the prosecutor who must record the trial, however. The Court Reporters Act, 28 U.S.C. Sec. 753(b), requires the verbatim recording of "all proceedings in criminal cases had in open court." "The duty to comply with Sec. 753(b) lies with the court, not the parties." United States v. Nolan, 910 F.2d 1553, 1560 (7th Cir.1990), cert. denied, 499 U.S. 942 (1991).
 
 
 11
 Although a criminal defendant has a right to a record on appeal including a complete transcript of the trial proceedings, a court reporter's failure to make a verbatim transcript does not automatically require reversal. United States v. Wilson, 16 F.3d 1027, 1031 (9th Cir.1994). The defendant must show that "specific prejudice" resulted from the failure to record. Id. "[W]here a defendant makes allegations of error which, if true, would be prejudicial, the unavailability of a transcript may make it impossible for the appellate court to determine whether the defendant's substantive rights were affected." Bergerco, U.S.A. v. Shipping Corp. of India, Ltd., 896 F.2d 1210, 1215 (9th Cir.1990).
 
 
 12
 The Adamsons have neither shown prejudice, nor demonstrated that the failure to record makes it impossible to evaluate their allegations of error. First, they do not advance specific claims of error. Instead, the Adamsons allege that without a transcript this court cannot determine which portions of the tapes were considered by the jury in finding Robert Don and Robert Kay guilty of overt acts but innocent of conspiracy, and which parts the judge relied on in ruling that certain statements challenged as hearsay were admissible as coconspirator statements. Second, they do not show that the jury must have relied on the tapes to find the Adamsons guilty as it did, or that the judge did not have grounds for his finding that the hearsay statements were admissible in direct testimony that was recorded in the transcript.
 
 
 13
 In United States v. Doyle, 786 F.2d 1440 (9th Cir.) cert. denied, 479 U.S. 984 (1986), tapes of conversations between the codefendants and a third party were played at trial, and the court reporter did not transcribe the tapes' contents. Like the Adamsons, Doyle claimed simply that "without knowing which portions of these tapes were played at trial, this court cannot adequately evaluate his claim that there was insufficient evidence to convict." Id. at 1442. The court disagreed, noting that the tapes were taken into the jury room, where the jury could listen to all or any portion of the tapes, and that the tapes were available as part of the record on appeal. Id. The failure to record the portions of the tapes played at trial thus did not preclude the court of appeals from determining their contents, and no reversible error occurred. Id.
 
 
 14
 As in Doyle, the tapes are in evidence in their entirety, and if the Adamsons made any specific assignments of error, this court could review them. Nevertheless, the Adamsons attempt to distinguish Doyle by complaining of the failure of the judge to send the tapes into the jury room. Because it was their own attorney who successfully objected to the tapes being in the room with the jury, any error was invited by the Adamsons. An invited error will result in reversal only when "necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice," United States v. Schaff, 948 F.2d 501, 506 (9th Cir.1991), and the Adamsons' appeal presents no such exceptional situation. Moreover, the court did not abuse its discretion by not sending the tapes into the jury room. See United States v. Taghipour, 964 F.2d 908, 910 (9th Cir.) (per curiam) (decision whether to allow tape transcripts into jury room is reviewed for abuse of discretion), cert. denied, 113 S.Ct. 283 (1992).
 
 II. Hearsay testimony
 
 15
 The Adamsons next contend that the trial court erred in admitting hearsay statements under the coconspirator exception to the hearsay rule. See Fed.R.Evid. 801(d). They argue that there was insufficient evidence for the court to find by a preponderance of the evidence that Robert Kay and Robert Don participated in a conspiracy. We review for clear error the district court's factual determination that a conspiracy existed. United States v. Arambula-Ruiz, 987 F.2d 599, 607 (9th Cir.1993).
 
 
 16
 The district court did not clearly err in finding the existence of a conspiracy by a preponderance of the evidence. In addition to the evidence cited by the Adamsons in their brief on appeal, the court saw documentary evidence that Robert Kay sold five sight drafts, and used drafts to purchase houses and cars and pay off loans, and that Robert Don paid off credit card debts with the drafts. The court also saw the tapes of the seminars, with Robert Kay and Robert Don participating, and a tape of a leaders' meeting at Happy Dutton's house with both Adamsons present. In addition, the court heard testimony that Robert Don and Robert Kay participated in a business meeting in August of 1987 at Happy Dutton's house, and in a seminar in Houston in October of 1987; that the organization was on various levels, with trips carrying cash to purchase sight drafts, sometimes with Robert Don and Robert Kay travelling, or with Robert Kay supplying the cash to be transported; that Robert Kay worked on the program with Happy Dutton and sold drafts; that both Adamsons spoke at a seminar in Sun Valley, Idaho; that Robert Kay opened up bank accounts to deposit the money; that the Adamsons received a commission and deposited cash in the accounts; that Robert Kay had a hidden office behind a false wall in his bedroom to run the operation; and that Robert Don sold drafts and notarized accompanying letters.
 
 
 17
 The Adamsons also identify one specific hearsay statement which they claim should not have been admitted, even if the coconspirator exception applied. The court allowed Raymond Patton, Happy Dutton's former companion, to testify that Happy Dutton told him that sight drafts were sold at a seminar in Houston, although Patton admitted he had no personal knowledge of the sales. The court admitted the testimony under the coconspirator exception. Because the court never found that Patton was a coconspirator, the Adamsons argue that Patton's hearsay statement therefore should not have been admitted into evidence.
 
 
 18
 The district court did find, however, that Happy Dutton was a coconspirator. It is her out-of-court statement that is in issue here. This court reviews for an abuse of discretion the district court's decision to admit Dutton's statement. United States v. Bland, 961 F.2d 123, 126 (9th Cir.), cert. denied, 113 S.Ct. 170 (1992).
 
 
 19
 The statement of a coconspirator is admissible if the evidence supports the inference that the statement was made while the conspiracy was in existence and in furtherance of the conspiracy. Arambula-Ruiz, 987 F.2d at 608. The Adamsons do not argue that the conspiracy was ended, or that Dutton's statement was not in furtherance of the conspiracy. Even if the Adamsons could show that the district court clearly erred in determining that the statement was in furtherance of an existing conspiracy, any error would be harmless, as two other witnesses testified that draft packets were sold at seminars, including the one in Houston.
 
 III. Admission of default judgment
 
 20
 The district court admitted into evidence a November 29, 1988, default judgment in Idaho state court against Robert Don, Robert Kay, and Jed Adamson (another defendant), among others. The government argued that the default judgment was relevant evidence of the Adamsons' criminal intent, because contrary to Jed Adamson's advice at a January 1988 seminar that participants should "fight for your rights with these drafts ... go to court, file suit, don't even wait for the bank to do it," the Adamsons themselves did not bother to defend their drafts in court. The Adamsons argue that the default judgment was not relevant.
 
 
 21
 The district court's determination of relevance is reviewed for an abuse of discretion. Schaff, 948 F.2d at 505. The district court did not abuse its discretion. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The default judgment was relevant to the Adamsons' intent to defraud the banks. The judgment tended to show that it was more probable that the Adamsons did not believe the drafts were legitimate methods of payment, as the Adamsons failed to appear to defend the drafts in court.
 
 IV. Bankruptcy petition
 
 22
 The district court admitted the bankruptcy petition of Robert Kay, dated September 26, 1988, which showed that Robert Kay owed three banks for rental homes purchased with sight drafts, and also owed money to two individual creditors who also sold him homes and were not paid. The Adamsons now argue that it was error to submit the bankruptcy petition because the prosecution used evidence of the nonpayment of the individual creditors and other information on the petition as "other act" evidence to impugn Robert Kay's character. The Adamsons' attorney, during an objection to the relevance of the petition, made a reference to Fed.R.Evid. 404, but did not object during the prosecutor's direct examination of Robert Kay regarding the petition.
 
 
 23
 The Adamsons first argue that the petition was not relevant evidence. Because it showed that Robert Kay did submit drafts to buy homes and pay off other debts, however, that argument fails. They also assert that the petition was improperly used as evidence of other acts under Fed.R.Evid. 404(a). Yet the Adamsons' counsel never requested an instruction limiting the use of the bankruptcy petition under Fed.R.Evid. 105, which provides that "upon request, [the court] shall restrict the evidence to its proper scope and instruct the jury accordingly." Because the Adamsons failed to request the limited use of the evidence, it was not reversible error for the district court to fail to give a limiting instruction. United States v. Multi-Management, Inc., 743 F.2d 1359, 1364 (9th Cir.1984) (where no request for limiting instruction regarding other criminal acts, failure to give instruction sua sponte is not reversible error).
 
 V. Failure to take judicial notice
 
 24
 The Adamsons argue that the trial court should have taken judicial notice of 11 U.S.C. Sec. 523(2)(A), which states that a discharge in bankruptcy does not extend to a debt incurred through fraud. A statute, however, is not an "adjudicative fact" under Fed.R.Evid. 201, but a legislative fact. No rule requires the court to take judicial notice of a legislative fact. See Fed.R.Evid. 201 advisory committee's note. The court did allow the Adamsons to introduce testimony on this issue.
 
 
 25
 The Adamsons also contend that the district court erred in refusing to give an instruction regarding the statute. In violation of Idaho Dist.Ct.Rule 51.1(a), however, they did not submit a written proposed instruction to the court. The district court did not abuse its discretion in refusing to give the instruction. See United States v. Federbush, 625 F.2d 246, 253 (9th Cir.1980) (no abuse of discretion to fail to accept proposed instructions not submitted in accordance with local rules).
 
 VI. Cross-examination
 A. Church membership
 
 26
 The Adamsons assign as error the district court's failure to sustain their objection to the prosecutor's question on cross-examination of Robert Don whether all members of the Adamson family were members in good standing of the Church of Latter-Day Saints. The Adamsons argue that the question violated Fed.R.Evid. 610, which provides that evidence of a witness's religious beliefs is not admissible to attack his or her credibility.
 
 
 27
 The district court did not abuse its discretion in allowing the question on cross-examination. On direct examination and over the prosecutor's relevancy objection, the Adamsons' counsel questioned Robert Don extensively about his family's and his membership in the Mormon church, and his church offices, activities, and religious practices, to establish a religious element for membership in the debt elimination program. The prosecution was entitled to ask Robert Don whether all his family were members in good standing, because the Adamsons "opened the door" to this issue. See United States v. Hegwood, 977 F.2d 492, 496 (9th Cir.1992), cert. denied, 113 S.Ct. 2348 (1993).
 
 B. Grand jury
 
 28
 The Adamsons contend it was an abuse of discretion to allow the government to ask Robert Don on cross-examination whether he appeared before the grand jury when invited. The Adamsons argue it was improper evidence of a specific incident as proof of character under Fed.R.Evid. 608.
 
 
 29
 On direct examination, the Adamsons' counsel asked Robert Don about a phone call he made to the United States Attorney for Idaho. Robert Don testified that he told the United States Attorney that he had "nothing to hide and I'd be happy to tell you anything that you would like to know about." On cross-examination, he added that he was never contacted by the government. The prosecutor then asked whether Robert Don had received a letter from her inviting him to appear before the grand jury, and he admitted he had. She then elicited the response that he had not testified. Counsel made only a relevance objection.
 
 
 30
 Adamsons' attorney opened the door to this line of questioning by asking Robert Don about his contacts with the United States Attorney, and his willingness to tell his story. It was not an abuse of discretion to allow the question. See id.
 
 VII. Inconsistent verdicts
 
 31
 The Adamsons argue that their acquittals on some counts and convictions on others are inconsistent, and that the inconsistency is proof that improperly admitted evidence prejudiced the jury. We reject that argument. "The fact that the various jury verdicts could be ... inconsistent is not a justification for setting aside the verdicts." Dallas v. Arave, 984 F.2d 292, 295 (9th Cir.1993).
 
 
 32
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3