UNITED STATES of America,
Plaintiff-Appellee,

v.

John E. KENNY, Trenton P. Oelberg,
and William L. Parker,
Defendants-Appellants.

Nos. 79–1544, 79–1545, 79–1563
and 79–1735.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1980.

Decided Jan. 23, 1981.

Rehearing and Rehearing En Banc
Denied April 30, 1981.

As Amended May 18, 1981.

Certiorari Denied June 8, 1981.
See 101 S.Ct. 3059.

1324

John A. Mitchell, San Diego, Cal., for Kenny.

Lawrence W. Campbell, San Diego, Cal., for Oelberg.

Peter J. Hughes, San Diego, Cal., for Parker.

Herbert Hoffman, Asst. U.S. Atty., San Diego, Cal., argued, for plaintiff-appellee; Michael H. Walsh, U.S. Atty., San Diego, Cal., on brief.

## AMENDED OPINION

Before TRASK and NELSON, Circuit Judges, and SOLOMON *, District Judge.

NELSON, Circuit Judge:

The earlier opinion in this matter, dated January 23, 1981, is withdrawn, and the following is substituted.

After a lengthy jury trial, appellants Kenny, Parker and Oelberg were found guilty on 14, 4 and 3 counts, respectively, of a multiple-count indictment alleging conspiracy, fraudulent government contracting activities, bribery, and tax evasion.[1] Each

---

* The Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

1. Appellant Kenny was originally charged with seventeen counts in the 23-count indictment of November 16, 1978, subsequently reduced to sixteen by the Government's pretrial motion to sever one count of income tax evasion. Kenny was convicted of fourteen of the sixteen remaining as follows: one count of conspiracy (18 U.S.C. § 371); seven counts of presenting false claims to the United States (18 U.S.C. § 287); four counts of paying bribes (18 U.S.C. §§ 201(b)(1), 201(c)(1)); and two counts of in-come tax evasion (26 U.S.C. § 7201). The jury found Kenny not guilty on two false claim counts. The remaining tax evasion count was dismissed on the Government's motion at sentencing.

Appellant Parker was charged with five counts, and was convicted of four as follows: one count of conspiracy, two counts of presenting false claims, and one count of accepting bribes. The jury found Parker not guilty on one false claim count.

has brought a direct appeal, asserting numerous errors. In addition, Oelberg has appealed the denial of his motion for new trial on grounds of newly-discovered evidence. The appellants have assailed almost every facet of this prosecution, from the pre-indictment to post-trial stages. For the reasons set forth below, however, we find that none of these contentions has merit, and we therefore affirm all convictions.

## FACTS

Kenny was the proprietor of a now-defunct firm in San Diego known as Ocean Market Consultants ("OMC"). OMC provided a variety of research, technical writing and document preparation services to government and industrial clients in the area.

The remaining defendants were civilian employees at the Naval Electronics Laboratory Center ("NELC") at nearby Point Loma. During the time period covered by the indictment, appellant Parker was the supervisor of NELC's Security Systems Programs Office, a section internally designated "Code 1500." Appellant Oelberg, along with defendants Warren and Lab, worked under Parker as members of the Code 1500 staff.

OMC obtained a substantial quantity of business from NELC, primarily through contracts let and supervised by Code 1500 personnel. A typical OMC–NELC contract, billed on a "time and materials" basis, called for OMC to prepare studies or manuals concerning Navy projects using raw data provided by the Navy. Once the final product, known as the "deliverable," was prepared and presented to NELC, an invoice would be sent showing the total hours worked at various billing rates, along with charges for materials and expenses.

Oelberg, Lab, and Warren shared adjoining offices at NELC, a few doors away from Parker's office, during most of their employment there. All four of these Code 1500 employees worked closely together and frequently signed for each other on NELC contracting documents. OMC personnel frequently visited Code 1500, and vice versa. OMC employees testified to seeing Parker, Oelberg, Lab, and Warren meet with Kenny individually in closed-door sessions.

From time to time during the period covered by the indictment, all four had contracting relationships with OMC. Navy records showed total payments to OMC totalling approximately $1.5 million between 1972 and 1976. The evidence indicated that many of these contracts and tasks were false in various respects, resulting in overcharges to the Navy, and consequent illicit profits to Kenny and OMC, of substantial sums of money. The evidence further indicated that in consideration for the issuance and approval of the fraudulent contracts and tasks, Kenny paid cash and check bribes to the defendants employed in Code 1500, as well as furnishing them with other items of value.

Appellant Oelberg was initially charged with five counts, subsequently reduced to four on the Government's motion to dismiss one false claim count. Oelberg was convicted of three of the four counts as follows: one count of conspiracy, one count of presenting false claims, and one count of accepting an illegal gratuity, as a lesser included offense under the bribery count. The jury found Oelberg not guilty on one false claim count.

Of the two other persons charged in the same indictment, only one was jointly tried with the appellants. This defendant, George J. Warren, has not appealed his convictions. Warren was charged with five counts, and was convicted of four as follows: one count of conspiracy, two counts of presenting false claims, and one count of accepting an illegal gratuity, as a lesser included offense under the bribery count.

The jury found Warren not guilty on one false claim count.

The other, Louis F. Lab, cooperated with the Government and testified extensively at trial as a government witness. Lab also made a surreptitious recording of a telephone conversation with Kenny, which was introduced at trial. Prior to trial, on the Government's motion, the case and counts against Lab were severed.

Appellants and Warren were sentenced on August 6, 1979, as follows: Kenny was concurrently sentenced to a total term of nine years imprisonment and concurrently fined a total of $50,000; Parker was sentenced to concurrent terms of imprisonment for five years, with possibility of parole; Oelberg and Warren were each sentenced to concurrent terms of imprisonment for two years, with possibility of parole.

### A. *Parker's Activities.*

Parker, in his role as head of Code 1500, set the stage for later illegal activities by arranging for the Navy to award three major contracts to OMC. Parker assured that OMC would receive the contract awards by representing to Navy contracting officials that OMC was a uniquely qualified "sole source" for the services required, bypassing any competitive bidding procedures. With respect to one contract, Parker was able to obtain the Navy's approval in about ten days, when normal contracting procedures would have take between 90 and 120 days, by misrepresenting that the contract was of extremely high priority calling for "Quick Reaction Capability." Similar misrepresentations were made with respect to the other two.

Under these contracts, Code 1500 personnel had at their disposal lump sums of money, out of which they contracted for individual "tasks" from time to time. OMC, in turn, would bill the Navy for "time and materials."

The evidence showed that OMC could quote on and bill for services under these tasks with very little scrutiny outside of Code 1500, and painted a devastating picture of overcharges and sharp practices by OMC, at Navy expense. The Government showed instances where billable hours invoiced on an OMC project vastly exceeded both the reasonable time required to complete such a project and the hours actually devoted to it by OMC. Other evidence showed forged and altered time cards, billings for employees that did not exist, and multiple billings for the same subcontractors' or employees' charges on several contracts. It appeared that Kenny had diverted a substantial amount of OMC revenues to his personal use.[2]

Kenny, testifying in his own defense, admitted that the employee manhours reflected on OMC's cost summary sheets were false, but claimed that this "paperwork ad-justment" was necessary because OMC either started work before a task was actually issued or had cost overruns on issued tasks. Parker, in turn, asserted that slow government contracting procedures hindered his efforts to provide fast response to his "customers" within the government, requiring him to employ previously existing contracts to finance new projects. This factor, along with ominous references to national security needs, purportedly accounted for task statements and invoices that did not match work done. However, neither Kenny nor any of the Code 1500 employees had *any* records to substantiate the claims of early starts or cost overruns, nor could they explain or justify the charges reflected on the OMC invoices.

The prosecution presented evidence showing that a group of tasks issued by Parker to OMC, totalling nearly $158,000, was largely fraudulent. In one case, involving a $58,000 contract to produce manuals for a pair of information-gathering devices on Navy submarines, the Washington, D.C. sponsor for the programs testified that he had never heard of OMC or Kenny, that the manuals called for were not appropriate at that point in time, and that he had neither authorized the tasks nor received any of the deliverables called for in the task. In another, a Washington D.C. sponsor for Navy nuclear intelligence projects reviewed three tasks (the subjects of three false claims counts), totalling $24,000, relating to underseas nuclear intelligence. He testified that no funds were ever made available to Parker for nuclear intelligence, that he had never heard of OMC or Kenny nor was he aware of any work done by OMC in that field, and that he had never authorized the tasks nor received the deliverables mentioned in the task statements. Both witnesses found it unusual that the tasks called for "one original—no copies." Further-

---

2. Because Kenny has disclaimed any challenge to the sufficiency of the evidence relating to his convictions, we have omitted considerable detail of the evidence against Kenny from this factual summary. While this may do less then complete justice to the Government's case, it allows us to address the questions actually raised in this appeal within manageable bounds.

more, none of the OMC employees who testified could recall working on any of the tasks.

Although the record does not disclose the exact nature of any arrangement Kenny and Parker may have had, the Government brought out a number of questionable facts indicating kickbacks or bribery. Parker was given an OMC telephone credit card, on which, from the partial telephone records available, he was shown to have charged over $1,000 worth of long-distance calls.[3] Both Kenny and Parker testified that Parker had repaid the bills in cash, although there was no evidence that any such repayment had occurred.

The Government also showed that Parker received business cards and stationery for a personal stamp trading business, magazine subscriptions, and a safe, all purchased for Parker by OMC, for which there was no evidence of repayment.

Parker purchased at least $18,000 worth of stamps between late 1971 and 1974. This activity coincided with the time period in which OMC received expanded business from NELC. Three witnesses recalled that once during 1974, they saw Parker in possession of a large sum of cash following a luncheon engagement with Kenny that preceded a scheduled trip by Parker to the East Coast. The prosecutor implied that cash converted into stamps would be difficult to trace.

**B.** *Activities of Oelberg, Lab, and Warren.*

As part of their official duties at NELC, Oelberg, Lab, and Warren each handled various projects for the government and arranged to contract for outside services—such as those provided by OMC—to aid in completing the projects. More significant, however, was an after-hours enterprise engaged in by these defendants.

1. Self Control Systems and Gray Gryphon Associates.

In March, 1972, Lab and Oelberg formed a partnership named "Self Control Systems" ("SCS") as a moonlight business to develop and market bio-feedback machines. Warren initially acted as an employee of SCS; later, in April, 1973, Lab withdrew from the partnership and Warren took his place.

Kenny, approached by the SCS principals, offered his assistance. At various times Kenny paid for materials or services supplied to SCS,[4] primarily through checks drawn on a shell corporation of Kenny's named "Gray Gryphon Associates," operated by Kenny using funds from OMC and another shell known as ITS. It maintained two bank accounts and a post office box, but had no actual employees. Gray Gryphon appeared as a subcontractor to OMC on some NELC contract invoices, fraudulently represented as a consulting firm. The funds paid out of the Gray Gryphon bank accounts were used to pay for services

---

**3.** In October, 1976, a federal grand jury subpoena was served at NELC, seeking the production of all NELC records relating to OMC. NELC employees testified that Parker became physically upset as a result of the service of the subpoena. Two employees testified that when Parker visited their office later that day, he was "gasping and distraught" about the subpoena. In response to their observation that if Parker had not committed any impropriety, he had nothing to worry about, Parker admitted that he had possessed and used the telephone credit card. He told one that he needed the credit card for his private stamp business.

The next day, Parker visited the office of another NELC official and disclosed his possession of the credit card. He advised the official that he needed the credit card because of the highly classified projects he handled at NELC.

At trial, Parker testified that as a "matter of convenience" he used the OMC credit card when making long-distance calls from his home phone, despite the higher cost of operator-assisted calls.

**4.** The Government established the following payments by Kenny on behalf of SCS: Gray Gryphon checks in December 1972 and January 1973 to a printing company ($819.75); OMC checks for approximately $750 to the same printing company for work done in July 1973; Gray Gryphon checks between April 1973 and August 1973 to "Dyna Pac" in San Diego for services to SCS ($2,776.22); a Gray Gryphon check to SCS in July 1973 for purchase of two SCS machines ($1,090). In addition, OMC's art department performed free services for SCS.

provided to SCS [5] and for personal expenses of Kenny, including several payments for the construction of his house.[6]

## 2. The Investigation of SCS.

In early 1973, an investigation was triggered when one of the SCS suppliers, a manufacturer of printed circuit boards, reported that SCS had ordered boards substantially identical to a Navy design it had earlier produced as part of a Code 1500 project. Navy officials and the FBI began inquiries into Gray Gryphon and SCS.

The complaint about SCS was referred to Parker, in his capacity as supervisor of Code 1500. It was through Parker's handling of this matter that the prosecutor linked Parker with the remaining defendants.

Witnesses testified that in late February or early March 1973, Kenny ordered his bookkeeping employees to gather up all Gray Gryphon records on the OMC premises, which he removed. One of the employees testified that Kenny told her that Parker had called and alerted him to the official investigation.

Parker, meanwhile, called Lab back from Washington to a March 5th meeting with Oelberg and Warren to discuss the investigation. He told them that the FBI and the Navy were investigating SCS, and told Lab in the presence of the others that "if this investigation gets into OMC's books" he would kill him. Parker testified that at the meeting, he was aware that Kenny had helped SCS in both marketing advice and art/design work. He testified that he "chewed them out royally" and told the three that he did not want them doing business with Kenny because he was a government contractor. Warren and Oelberg, however, had no recollection of being

chewed out by Parker because of the SCS–Kenny relationship.

After the meeting, Parker ordered Oelberg and Warren to gather all SCS material and store it in Parker's home. Two days later, he allowed them to reclaim the material, stating that he had "killed" the investigation.

Despite the implications of a moonlight business sponsored by a government contractor, the only official action taken by Parker with respect to these employees was to require them to fill out "Statements of Outside Employment." This they did, falsely certifying that they had no conflicting interests with firms contracting with the government. Parker, as their supervisor, approved the statements as "considered to be fully proper," and made no further entry or memorandum regarding the incident.

## 3. Fraudulent Contracting Activities.

The prosecution presented evidence to show that Lab, Oelberg and Warren had all engaged in fraudulent activities during this time period. Lab, as a Government witness, testified at length about an elaborate scheme to funnel government money through a legitimate government contractor to a dummy subcontractor set up by Kenny (the so-called MRL–ITS transaction), in which Lab was to receive $30,000 out of the $80,000 contract price. He testified further about a second incident in which he and Warren agreed to issue a phony contract in the amount of $25,000 to Kenny, so that Kenny could meet obligations on a $75,000 line of credit ("factoring") secured by OMC invoices, many of which were false.[7]

5. The manager of Dyna Pac, see note 4, supra, questioned Oelberg and Warren about Gray Gryphon. He testified that he was informed by Oelberg and Warren that Gray Gryphon was a psychologist who had funded their company.

6. Kenny testified that Gray Gryphon was formed by him to write a book about "special warfare." Later on, he used the company only for "special events." The phony Gray Gryphon invoices submitted to OMC, he said, were used

to repay Kenny for loans he had made to the company. Kenny testified that he used Gray Gryphon checks to pay for SCS bills because "OMC checks would have been totally inappropriate."

7. Again we note our omission of detail. Lab's testimony was a major part of the Government case against Kenny, but we need not relate it in great length to explain our decision because Kenny has not argued insufficient evidence.

Oelberg's primary activity during the relevant time period was a project known as "IOIC–SUPRAD Integration," involving computerized communications aboard aircraft carriers. Coincident with the period in which Kenny was paying for SCS services, Oelberg awarded three IOIC–SUPRAD tasks to OMC totalling $80,000. Oelberg stated that he had no difficulty separating business from personal activities during this period, and saw no impropriety in Kenny's "investment" in SCS. Nonetheless, Oelberg had considerable difficulty remembering which OMC employees worked on the assigned tasks.[8] He claimed that as a government employee he had never heard of Gray Gryphon, and had no knowledge that Gray Gryphon checks were being used to pay for SCS expenses. However, it was established that the day after SCS received a check from Gray Gryphon for $1,090,[9] Oelberg approved an OMC invoice listing Gray Gryphon as performing $1,554 in consulting services for OMC on a "Fleet Satellite Communications" contract. With respect to the total of $6,100 billed by OMC for Gray Gryphon consulting services under that contract, Oelberg claimed that the consulting fees actually represented anticipated travel costs, despite a separate travel cost allocation of $7,500 on the same task.

Lab testified that Oelberg had told him of an arrangement to "split" three "stubs" —the nickname for below-$2,500 contracts—with Kenny, and the prosecution presented evidence with respect to two, representing two false claims counts. The first called for an operating procedures manual for IOIC–SUPRAD, was placed with OMC on May 15, 1974, and specified delivery on May 31 at a cost of $2,489.20. The second called for a "program specification report" for the same project, was placed two days before the program funds would expire (June 28, 1974), and specified delivery less than a month later at a cost of $2,441.40.

The Washington, D.C. sponsor for IOIC–SUPRAD testified that although Oelberg had managed the earlier stages of the project, the last work done at NELC was a prototype demonstration in January 1974. The project was then transferred to Philadelphia. With respect to the two tasks above, the witness testified that an acceptable manual and report could not be produced for $2,500, that the manual and report were not logical items to be produced in May and June 1974 since the activity center in Philadelphia used incompatible equipment that required different documentation, that he never authorized or discussed

8. In a particularly telling exchange, Oelberg was cross-examined by the prosecutor with respect to a task he had arranged to give to OMC:

> Q. Who was the [OMC] employee in September of '72 that was working on the IOIC/SUPRAD project?
> A. I don't know.
> Q. This was a $46,000 task?
> A. That's right.
> Q. Who was the person you met and dealt with in this task?
> A. I don't recall.
> Q. But it was your task? Was it a number of people?
> THE COURT: Do you want an answer?
> MR. HOFFMAN: I'll try again.
> Q. Was it a number of people, Mr. Oelberg?
> A. I don't know. I don't know, Mr. Hoffman.
> . . . .
> Q. Mr. Oelberg, you have testified on direct that the IOIC/SUPRAD was your project.

> A. Yes, it was.
> Q. It was in effect your pride and joy?
> A. That's right.
> Q. Now who, in effect, from OMC was working on this project along with you, or was anybody working?
> A. Oh, I'm sure somebody was working, but I don't recall.
> . . . .
> Q. You don't recall, then, who it was that you worked with on this task?
> A. No, I do not.
> R.T. 6755–57.

9. Kenny issued this Gray Gryphon check for the purchase of two SCS biofeedback machines at $545 apiece. Oelberg's wife testified that the day these machines were sold she had packed them up, then accompanied Oelberg to Kenny's office where Oelberg carried them inside. Oelberg, who had earlier testified that Kenny was an "investor" in SCS, could not explain why an investor would pay retail price to buy products of his own company.

either task with Oelberg, that he never received a deliverable on either task, that he was unaware of any prior work by OMC on IOIC–SUPRAD, and that he found the contract requirement of one original, no copies, unusual. OMC employees who testified could not recall working on either task.[10]

The prosecution presented evidence concerning several fraudulent contracts issued to OMC by Warren. In one particularly egregious example, OMC was awarded an $18,000 contract to prepare a printed instruction manual for the Army regarding a voice scrambler device developed for the Navy. The Navy had named the device Voice Activated Crypto Controller, or VACC, whereas the Army wished to call it Radio Wire Integration Device, or RWID. An OMC employee testified that the only work OMC had to do to prepare the Army manual was to alter each reference to "VACC" in an earlier Navy manual to "RWID". The internal cost summary for this project showed 12 hours work, and together with printing costs, the total cost of the RWID manual could not have exceeded $700.[11]

## I. THE CONSPIRACY COUNT

From the beginning, from pretrial motions through this appeal, the defendants have maintained that no single conspiracy could be, or was, shown at trial. The Government has consistently taken the opposite view. The District Court's rulings generally favored the Government's position. The appellants now point to these rulings as error.

Taken together, the appellants' arguments regarding the conspiracy aspects of this case amount to four major contentions: that the District Court should have limited the government's proof, requiring that a single conspiracy be proved prior to reception of other evidence; that the evidence

proved multiple conspiracies, in a prejudicial (and thus fatal) variation from the indictment; that the District Court, in denying defendants' motions to strike, erroneously admitted evidence relating to the conspiracy; and that the jury was inadequately instructed on the law of conspiracy. We find none of these contentions persuasive.

### A. Order of Proof.

The defendants moved initially to require the Government to prove the existence of the alleged single conspiracy prior to introducing other evidence relating to the defendants' participation in the conspiracy. The District Court rejected this plan, and ruled that the Government could proceed in its desired order and present evidence subject to a motion to strike. The appellants claim this was "prejudicial error."

The appellants have urged upon us, as they did the District Court, Justice Jackson's concurring remark in *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949): "Strictly speaking, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all." Experience indicates, however, that a rigid requirement of this nature would impose substantial and needless burdens on the criminal trial process. Witnesses would frequently have to be called at least twice, with considerable hazard of confusing the jury and prolonging the trial. The District Court would face numerous difficult rulings based on nice distinctions between evidence going to the existence of the conspiracy and evidence of a defendant's acts in perpetration of the conspiracy. In a case such as the present one, where one of the alleged conspirators testifies for the Government, such distinctions would become nearly impossible to draw.[12]

10. Oelberg was acquitted on one count and convicted on the other.

11. Warren was acquitted on one count and convicted on two counts involving three tasks.

12. Taken in context, Justice Jackson's observations about the problems attending conspiracy

trials make clear that even he doubted whether his "strict" order of proof was capable of implementation, as he noted that "the order of proof of so sprawling a charge is difficult for a judge to control." 336 U.S. at 453, 69 S.Ct. at 723.

■ The order in which parties adduce proof is, in general, a matter for the trial judge to determine, subject to review for abuse of discretion. *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); Fed.R.Evid. 611(a). This rule reflects the need for flexibility and judgment on the part of the District Court in response to the particular nature of each case before it. The procedure requested by the defendants does have the virtue of being "fail-safe": If proof of the conspiracy fails and the danger of prejudice in a continued joint trial appears great, the District Court can at an early stage declare a mistrial and order separate retrials. Indeed, cases may well arise in which the court entertains sufficient doubt about the Government's ability to establish a conspiracy as to make such a procedure appropriate. But the District Court need not adopt this procedure; it is a matter of discretion.

■ In this case, the District Court had before it a trial memorandum giving a summary of the evidence the Government proposed to introduce that would establish a conspiracy, and the proposed order of proof. In addition, the court had before it arguments that many of the witnesses necessary to prove the conspiracy would have to be recalled for further testimony in relation to the substantive counts, and that the defendants' proposed order of proof was likely to confuse the jury. The District Court had an adequate basis on which to make its ruling, and properly exercised its discretion in denying the defendants' motion and allowing evidence to be received subject to a motion to strike. *See, e. g., United States v. Vargas-Rios*, 607 F.2d 831, 835–37 (9th Cir. 1979); *United States v. Watkins*, 600 F.2d 201, 204–05 (9th Cir. 1979), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1980); *United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979); *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir. 1978); *United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977).

B. *Multiple versus Single Conspiracy.*

The appellants have here renewed their argument made below that the Government failed to establish one overall conspiracy at trial. They argue that, at most, separate conspiracies involving NELC defendants transacting individually with Kenny were shown. Both Parker and Oelberg claim substantial prejudice to their respective defenses as a result, owing to the danger of "guilt by association" in a joint trial with Kenny, as well as the inadmissibility of large portions of Lab's testimony against them if they were not co-conspirators.

■ It is true that if the indictment charges jointly tried defendants with participation in a single conspiracy, but the evidence reveals multiple, discrete conspiracies, such a variance of proof *may* be so prejudicial as to require reversal. Reversal is called for "if the variance between the indictment and the proof affects the substantial rights of the parties." *United States v. Friedman*, 593 F.2d 109, 116 (9th Cir. 1979); *see Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Thus the review of such a case involves two inquiries: was there a variance, and if so, was it prejudicial. *United States v. Durades*, 607 F.2d 818, 819 (9th Cir. 1979).

■ The conspiracy alleged here takes the form of a *wheel*, with one central hub— Kenny—dealing with the "spokes"—the other defendants—in individual transactions. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Without more, we agree that such a fact pattern may suggest at most a cluster of separate conspiracies, rather than the "concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose" found in a single conspiracy. *United States v. Monroe*, 552 F.2d 860, 862–

63 (9th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1009 (1977). To follow the wheel metaphor, establishing a single conspiracy in a case such as this generally requires that the Government supply proof that the spokes are bound by a "rim"; that is, the circumstances must lead to an inference that some form of overall agreement exists.

The nature of that "rim" defies precise statement, but general principles are well established. The evidence must show that each of the defendants was involved. *United States v. Beecroft*, 608 F.2d 753 (9th Cir. 1979). A meeting of the minds must be demonstrated. *United States v. Peterson*, 549 F.2d 654 (9th Cir. 1977). Mere association and activity with a conspiracy is insufficient. *United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1976). However, a formal agreement between the conspirators is not necessary. *United States v. Camacho*, 528 F.2d 464, 469 (9th Cir. 1976). The agreement may be inferred from the defendants' acts pursuant to the fraudulent scheme or other circumstantial evidence. *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978); *United States v. Oropeza*, 564 F.2d 316, 321 (9th Cir. 1977); *United States v. Anderson*, 532 F.2d 1218 (9th Cir. 1976). "The government need not show direct contact or explicit agreement between the defendants. It is sufficient to show that each defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture." *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978). Once the existence of a conspiracy has been established, evidence of only a slight connection is necessary to convict a defendant of knowing participation in it. *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977).

In applying the foregoing legal standard to this case, we view the question of whether a single conspiracy has been proved, rather than multiple conspiracies, as essentially that of sufficiency of the evidence. The evidence need not be such that it excludes every hypothesis but that of a single conspiracy, *cf. United States v. Nelson*, 419 F.2d 1237, 1240 (9th Cir. 1969); rather, it is enough that the evidence adequately *supports* a finding that a single conspiracy exists. Thus, the critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980); *United States v. Bailey*, 607 F.2d 237, 243 (9th Cir. 1979). In the instant case, this Court would have to be able to say that *no* rational trier of fact could have found a single conspiracy on this evidence before we could disturb the jury's finding, implicit in its guilty verdict, that a single conspiracy had been proved.

We are persuaded, in reviewing the evidence presented below, that it amply supports a finding of a single conspiracy. The wheel, as it were, has been adequately "rimmed." In particular, we feel that the events surrounding Self Control Systems and the 1973 investigation provide a substantial basis for the inference that "each defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were dependent on the success of the entire venture." *Kostoff, supra*, 585 F.2d at 380. At the time the Navy investigation began, Kenny removed Gray Gryphon records from OMC, Parker had SCS materials gathered and stored at his house, and the other defendants executed insincere statements that they had no dealings with outside contractors that would generate any conflict of interest with Navy work. The defendants' actions strongly suggest both an awareness of improper dealings between OMC and the NELC defendants, and a belief that an investigation of OMC must be avoided at all costs, lest it reveal past wrongdoing and jeopardize future schemes. The evidence indicates that illicit activities continued after the 1973 investigation, after

the Navy investigation had been "killed" by Parker. The jury had sufficient evidence from which to find a single conspiracy.

Because the evidence was sufficient to support a finding of a single conspiracy, no variance from the indictment has been shown. It is thus unnecessary for us to decide whether any such variance would have been prejudicial.

## C. Admission of Evidence.

Following the government's case-in-chief, each defendant moved to strike wholesale quantities of evidence as to him. The defendants argued that the existence of a single conspiracy had not been adequately shown, so that the acts and admissions of alleged co-conspirators could not be admitted against them. The District Court ruled that four aspects of the evidence were admissible only as to specific defendants,[13] and requested that a cautionary instruction be drafted concerning that evidence. The defendants, however, evidently thinking that such an instruction might draw too much attention to that evidence, decided they did not want such an instruction, and none was given.

■ The defendants' broad motion covered a substantial amount of direct, non-hearsay evidence that was plainly relevant to show the nature of the conspiracy, as well as such things as motive, intent, and knowledge of participants. The motion also covered out-of-court statements by co-defendants (all of whom testified) that might be considered hearsay as to the remaining co-defendants in the absence of a conspiracy.

The threshold of admissibility of evidence relating to co-conspirators is comparatively low. *United States v. Watkins*, 600 F.2d 201, 204 (9th Cir. 1979), *cert. denied*, 441

U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1980); *Carbo v. United States*, 314 F.2d 718, 735–37 (9th Cir. 1963); *see United States v. Peterson*, 549 F.2d 654, 657 (9th Cir. 1977). The judge need only make the preliminary finding that a *prima facie* showing of conspiracy, and defendants' membership in it, has been made; the jury can then decide, on the basis of the evidence, whether the conspiracy exists beyond a reasonable doubt, and whether a given defendant participated in it. *United States v. Testa*, 548 F.2d 847, 853 (9th Cir. 1977).

■ The District Court specifically ruled that the Government had established, by sufficient independent evidence, the existence of the conspiracy and the defendants' membership in it. R.T. 5337. We are satisfied that at the close of the Government's case-in-chief, the prima facie standard was adequately met, and that all of the evidence with respect to which the District Court denied appellants' motions to strike was admissible in connection with the charged conspiracy. We note further that even though the defendants declined to draft a cautionary instruction, the jury was instructed that "statements or acts of any conspirator, which are not in furtherance of the conspiracy, or made before its existence, or after its termination, may be considered as evidence only against the person making them." R.T. 7945–46. Thus we find no error in the receipt of this evidence.[14]

## D. Jury Instructions on Conspiracy.

The appellants have made two arguments relating to the trial jury instructions. First, the appellants argue that the jury was insufficiently instructed on the multiple conspiracy/single conspiracy issue. Second, the appellants argue that the in-

---

**13.** The four areas were (1) Parker's reaction to the NELC grand jury subpoena in 1976; (2) Parker's stamp collection and trading activities; (3) the costs of building Kenny's home; and (4) certain conversations by Lab with Kenny and Parker after he was interviewed by the FBI in early 1978.

**14.** Kenny and the other appellants have specifically objected to the admission of so-called

"factoring" evidence, as well as evidence that Kenny's personal expenses were "run through" OMC, on the grounds that the evidence was both irrelevant to the charges in the indictment and prejudicial. The evidence was relevant to the conspiracy charge, however, in showing Kenny's motive for arranging the false transactions, and was properly admitted.

structions, by not elaborating on the unlawful nature of the conspiratorial agreement, were inadequate to guard against "guilt by association," where the defendants worked closely together and the jury might have inferred from that a conspiratorial relationship.

When a defendant's jury instructions have been refused, the following principles apply. The jury must be instructed as to the defense theory of the case, but the exact language proposed by the defendant need not be used, and it is not error to refuse a proposed instruction so long as the other instructions in their entirety cover that theory. The court examines the instructions as a whole, rather than merely viewing the failure to give any one instruction. *United States v. Sibley*, 595 F.2d 1162, 1165 (9th Cir. 1979); *United States v. Kaplan*, 554 F.2d 958, 968 (9th Cir. 1977), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1978).

We have examined the instructions given by the District Court, and we find them adequate viewed as a whole. As to the single/multiple conspiracy question, the instruction given specifically stated that "proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment." R.T. 7946. The instruction further directed the jury to acquit any defendant not found a member of the conspiracy charged in the indictment. In the context of the remaining instructions, this one adequately covered the defense theory.

Similarly, the jury was instructed that "mere similarity of conduct among various persons, and the fact that they may have assembled together and discussed common aims and interests, does not necessarily establish the existence of a conspiracy," and that "the evidence in the case must show beyond a reasonable doubt that the members willfully or in some way or manner positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan." R.T. 7943. Again, we find that this instruction, viewed in the context of the remaining instructions, adequately covered the defense theory, guarding against guilt by association.

## II. THE KENNY–LAB TAPE RECORDING

One of the more dramatic items of evidence offered by the prosecutor at trial was a tape recording made by Lab of a telephone conversation he had had with Kenny prior to Kenny's indictment. The tape was played before the grand jury that returned Kenny's indictment; later, it was played before the trial jury, at the close of the prosecutor's cross-examination of Kenny, for purposes of impeachment. In the taped conversation, Kenny and Lab discuss a number of aspects of the then-pending investigation into OMC–NELC contract improprieties, and make detrimental references to the other codefendants and their role in the matter.

The defendants below advanced a variety of arguments against use of the tape in whole or part, all of which were rejected. On appeal they argue that the recording, made by Lab as a government informant, violated Kenny's constitutional rights and constituted a breach of ethics by the prosecutor, and that it was error to admit the complete tape against Kenny for impeachment purposes. We find neither of these contentions meritorious.

### A. *Exclusion Because of the Manner of Obtaining the Tape.*

Lab alone was indicted by the grand jury in May 1978. Shortly after that he agreed to cooperate with the Government. After learning that Lab had had several telephone conversations regarding the OMC investigation with Kenny, Parker, and Warren, the prosecutor arranged for the FBI to provide Lab with telephone recording equipment. Lab received the equipment on September 15, 1978.

On September 20, 1978, Lab recorded a telephone conversation with Kenny. Although Lab initiated the call, the substantive conversation which followed did not occur until Kenny had gone to a phone

booth for "more privacy." This tape recording, which contains a number of damaging admissions by Kenny, was given to the FBI, and was later played before the grand jury. On November 16, 1978, the grand jury returned the indictment underlying this prosecution, which marked the first time Kenny had been indicted, arrested or charged.

Kenny argues on four fronts that his indictment based on the recording was tainted and should have been dismissed, and that the recording itself should have been excluded at trial. Kenny's arguments are (1) that his Fifth Amendment rights against self-incrimination were violated; (2) that the tape recording was obtained in derogation of his Sixth Amendment right to counsel; (3) that the electronic recording of a telephone booth conversation violated his Fourth Amendment rights, and (4) that the recording was the product of an ethical violation by the prosecutor, who had, in effect, made direct contact with a client known to be represented by counsel. We can discern no merit in these arguments.

■ As to his indictment, it is clear that even if Kenny *could* make out a constitutional violation with respect to the manner of obtaining the tape recording, an otherwise valid indictment would not be dismissed. *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1973); *see Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

As to exclusion at trial, the District Court correctly rejected these arguments, as the following discussion indicates.

### 1. Fifth Amendment Argument.

■ Because there was no "custodial interrogation," no fifth amendment violation appears here. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 344–46, 96 S.Ct. 1612, 1615–16, 48 L.Ed.2d 1 (1976).

### 2. Sixth Amendment Argument.

Kenny argues, and the government readily concedes, that the government was aware that Kenny was represented by counsel at the time the telephone conversation was recorded. Thus aware, Kenny argues, the government was required to notify Kenny's counsel prior to any questioning by a government agent, citing such cases as *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

■ At the time the recording was made, Kenny had not yet been charged, arrested or indicted. The short answer to Kenny's contention that his right to counsel was breached is that the right to counsel is not viewed to attach prior to the initiation of adversary judicial proceedings against an accused. *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). Where a case is still in the investigative stage, or in the absence of a person's being charged, arrested, or indicted, such adversary proceedings have not yet commenced, and thus no right to counsel has attached. *E. g., United States v. De Vaughn*, 541 F.2d 808, 809 (9th Cir.), *cert. denied*, 429 U.S. 984, 97 S.Ct. 501, 50 L.Ed.2d 594 (1976).

Furthermore, as the District Court observed, the right to counsel sought by Kenny would severely cripple the use of undercover methods to investigate crimes. Those engaged in ongoing criminal activity would be encouraged to obtain "house counsel," who would have to be informed prior to government use of informants in the presence of the clients; this would largely destroy the effectiveness of such informants. *See United States v. Masullo*, 489 F.2d 217, 222–24 (2d Cir. 1973).

We feel, therefore, that Kenny has failed to demonstrate any violation of his sixth amendment right to counsel in the obtaining of the tape recording.

### 3. Fourth Amendment Argument.

■ Kenny argues briefly that the Lab recording violated the rule in *Katz v. Unit-*

ed States, 389 U.S. 347, 349, 352–53, 88 S.Ct. 507, 509, 511–12, 19 L.Ed.2d 576 (1967), delineating a reasonable expectation of privacy for those using public telephone booths. He further argues that a warrant should have been obtained prior to this "search." This line of argument, however, ignores Lab's knowing participation in the recording of the conversation. As the Supreme Court has noted, the Constitution "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" *United States v. White*, 401 U.S. 745, 749, 91 S.Ct. 1122, 1125, 28 L.Ed.2d 453 (1971), *quoting Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966). We can perceive no fourth amendment violation here.

### 4. Ethical Violation Argument.

■ Kenny argues that Lab's contact with Kenny amounted to a violation of DR 7–104(A)(1) of the ABA *Code of Professional Responsibility.*[15] He argues that the prosecutor, through Lab, made a prohibited direct contact with a client known to be represented by counsel on the subject of the representation. The product of the misconduct, the tape, should therefore have been excluded at trial.

The identical contention was raised and rejected in *United States v. Lemonakis*, 485 F.2d 941, 955, 956 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974), and we reject it here. We again emphasize the factual setting of the tape recording: a non-custodial environment, prior to Kenny's charge, arrest, or indictment. In our view, the Government's use of such investigative techniques at this stage of a criminal matter does not implicate the sorts of ethical problems addressed by the Code. While the present case provides no opportunity for us to say just when the ethical line might be crossed, *cf. United*

*States v. Henry*, 447 U.S. 264, 275 n. 14, 100 S.Ct. 2183, 2189 n. 14, 65 L.Ed.2d 115 (1980), we do not believe it has been crossed here.

### B. *Admissibility of the Tape for Impeachment.*

The tape recording was played at the close of the prosecutor's cross-examination of Kenny, for purposes of impeachment. Kenny argues that the use of the tape was improper as impeachment, and the other appellants argue that references to them contained in the tape should have been edited out before it was played. We are unmoved by these arguments.

### 1. Admissibility as to Kenny.

Assuming the tape recording was not the product of a violation of Kenny's rights, it was admissible against him on a variety of theories.

■ Under the rule of *Brown v. United States*, 356 U.S. 148, 154–55, 78 S.Ct. 622, 626–627, 2 L.Ed.2d 589 (1958), the credibility of a testifying defendant "may be impeached and his testimony assailed like that of any other witness." We have found no authority, and none is cited in the briefs, suggesting that a tape recording otherwise admissible cannot be used for this purpose. Indeed, the cases reflect a liberal attitude toward the range of evidence that may be admitted for purposes of impeachment. *E. g., United States v. Palmer*, 536 F.2d 1278, 1282 (9th Cir. 1976); *United States v. Stanfield*, 521 F.2d 1122, 1128 (9th Cir. 1975). Thus the only genuine issue with respect to admitting the tape against Kenny is whether some other rule of evidence rendered the tape inadmissible.

■ We think not. His own statements on the tape constitute admissions of a party opponent, defined as "not hearsay" by Fed. R.Evid. 801(d)(2).[16] They appear indepen-

---

**15.** "During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior

consent of the lawyer representing such other party or is authorized by law to do so." DR 7–104(A)(1), ABA Code of Professional Responsibility.

**16.** "(d) A statement is not hearsay if—

dently admissible as prior inconsistent statements, particularly in view of the fact that the prosecutor appears to have laid the requisite foundation under Fed.R.Evid. 613.[17]

■ Kenny's counsel argues that the scope of Rule 801(d)(2) is impliedly limited by Rule 613, so that prior statements cannot be introduced unless they are inconsistent with testimony on the stand. Following this logic, he offered to put Kenny on the stand at trial and have him admit to all of the statements on the tape. The tape, he reasoned, would cease to be inconsistent, and thus cease to be admissible.

This reading of Rule 801(d)(2) is plainly wrong, especially in light of the final sentence in Rule 613 expressly exempting Rule 801(d) from its provisions, and we reject it. Kenny's statements were admissible.

■ The statements by Lab on the tape present a more difficult problem, but not a formidable one. If they were offered solely for the truth of their assertions, they would be classed as hearsay. They are, however, an essential part of the conversation used to impeach Kenny–no one could follow the conversation if only Kenny's half were played–and thus integral to the impeachment evidence, admissible subject only to the judge's discretion as expressed in Fed.R. Evid. 403 (allowing exclusion of evidence where the probative value is substantially outweighed by the danger of unfair prejudice).

■ Furthermore, as other Circuits have observed, Lab's half of the conversation, to the extent "adopted" by Kenny, can be treated as a group of adoptive admissions by Kenny, admissible under *Fed.R. Evid.* 801(d)(2)(B). *United States v. Lemonakis*, 485 F.2d 941, 949 (D.C.Cir.1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); *United States v. Metcalf*, 430 F.2d 1197, 1199 (8th Cir. 1970) ("reciprocal and integrated utterance between the two.").

Finally, there is no confrontation problem involving non-testifying codefendants as in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Lab was available for cross-examination by Kenny, under an express understanding with the prosecutor, alleviating the confrontation problem. *Nelson v. O'Neil*, 402 U.S. 622, 626, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971). In our view, therefore, no barrier existed to admitting the tape against Kenny as was done below.[18]

■ It is true that the Government, by using the tape for impeachment rather than presenting it during its case-in-chief, was able to play it to the jury at a later and perhaps more effective point in the trial. This choice of tactics was legitimately available to the Government, however, and indeed was a prudent one. Had the tape been played earlier, Kenny might have chosen not to testify, creating *Bruton* problems with respect to Parker, Oelberg, and Warren.

### 2. Prejudice to Parker and Oelberg.

■ The tape contained damaging references to Parker and Oelberg, many of them uttered by Lab.[19] Both objected

---

. . .

(2) The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity . . . ." Fed.R.Evid. 801(d)(2)(A).

17. "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)."

Fed.R.Evid. 613(b).

18. We would point out that "even if the conspiracy had ended prior to the recorded conversations, evidence of subsequent acts may be admitted 'to elucidate the nature of the prior conspiracy.'" *United States v. King*, 587 F.2d 956, 962 (9th Cir. 1978), *quoting United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977).

19. The pertinent portions of the conversation are reproduced below:

LL [Louis Lab]: This is something that I have always wanted to know, is how deeply Parker was involved, just for my own benefit.

strenuously to the admission of those statements, arguing that they did not go to

Kenny's credibility, and that their value as impeachment was strongly outweighed by

JK [John Kenny]: Oh, we had—he was—he had some s___ going on.

LL: Yeah.

JK: But it was always under—he never was straight about it. He always had this that he had to do or that that he had to do.

LL: Yeah.

JK: And I don't really know, uh, whether it was true or not.

LL: Yeah.

JK: Okay. I mean like I, you know, did some things for some, uh, a company back there, that I don't know whether it was true or not.

LL: Yeah.

JK: And I didn't care. He told me it was, and I did it.

LL: Yeah, yeah.

. . . .

LL: What company was it back there?

JK: Taur—the Taurus Company.

LL: Taurus?

JK: Yeah.

LL: I'll be Goddamned.

. . . .

LL: Uh—it looks like they're really sponging into everything, John.

JK: Yeah.

LL: And uh—I—I—I—just—

JK: Listen, when this f___ing thing pops, it's going to be so big.

LL: Yeah.

JK: And so f___ing messy.

LL: Right. So, you know Bill. You know, see, the thing is, it was so screwed up about Bill was that he was buying all these stamps, you know, huge, huge blocks of stamps.

JK: Yeah.

LL: And it was obvious he didn't have the resources to do that.

JK: Yeah.

LL: And so, you know—you know, everybody was speculating.

JK: Yeah.

LL: You know, and they said—they—they asked me at the time what—"What, if anything—do you know anything about Bill's stamps?" And I just basically said, "No."

JK: Yeah.

. . . .

LL: So—so apparently, uh, John (sic) was getting stamp money, and big stamp money, because he was showing the purchases of anywhere from two to ten thousand dollars.

JK: Who?

LL: Bill was.

JK: Oh, well—well, I could tell you this. Okay. I want to make this clear to you.

LL: Yeah.

JK: There was never anything that transpired between he and I that was of any magnitude close to what transpired between you and I.

LL: Yeah.

JK: I mean, this is penny-ante s___.

LL: Right.

JK: Okay?

LL: Right.

JK: So, two to ten thousand, don't know anything about it.

LL: Yeah. Yeah, I wonder—did any big sums of money go to Taurus?

JK: No. Nickel, dime s___.

LL: Yeah.

JK: Nickel, dime s___. You know, $600, $700, that kind of crap.

LL: I think he had a lot of agreements then.

JK: Then he must have.

. . . .

JK: [Y]ou see, if what he told me was the truth, okay?

LL: Yeah.

JK: Of the dealings with him. He didn't have a f___ing thing to worry about.

LL: Yeah.

JK: You know, he might have got his hands slapped.

LL: Yeah.

JK: Uh, for instance, the Taurus thing, where, uh, I was supposed to be hiring cleaning services and other s___, where there was, you know, minute little pieces of fifteen-hundred dollar s___ for this or that.

LL: Yeah.

JK: You know. And on most of these there was always—there was always a hardware story with it or something like that.

LL: Yeah.

JK: So it—it didn't amount to piddly s___.

LL: Yeah.

JK: And then, I don't think it amounted to, uh, ten grand the whole time.

LL: Yeah.

JK: So you know, worth piddly s___, but it had to be something else.

Elsewhere in the conversation:

JK: Have they—let me ask you a question. There's no way that this can be tapped, right?

LL: Yes, not that I—no. From what the uh—uh—my attorney said, I'd—you know, I'd—I—I—

JK: Well, I'm going to turn around so nobody can see my face when I say this (laughing).

LL: Right. Can't read your lips.

JK: Has anybody talked about Trent Oelberg?

LL: Well, I—that's one thing I don't know. I know that when they came out to—to—to, uh, talk to me—

JK: Yes.

LL: —they asked in depth about Self Control Systems.

JK: Yeah.

their prejudicial impact on Parker and Oelberg. They argued that those portions of the tape should have been edited out before it was played for the jury.

The District Court, having reviewed the tape and a transcript of it, denied the requests to redact the tape, and allowed it to be played in its entirety, with cautionary instructions before and after to the jury that it was being admitted *only* against Kenny. While we recognize the potential for prejudice in a case such as this, we feel the District Court acted within its discretion in admitting the entire tape recording as it did.

First of all, the references to Parker and Oelberg were germane to Kenny's credibility, and thus fair game for impeachment, because Kenny had denied any wrongdoing with respect to them when he testified. The discussion on the tape strongly undermined Kenny's position.

Second, the court took some pains to instruct the jury that the tape was being admitted solely against Kenny. The District Court acted properly to minimize the danger of prejudice through cautionary instructions. *See, e. g., United States v. Vargas-Rios*, 607 F.2d 831, 835 (9th Cir. 1979).

Finally, there seems to be no *Bruton* confrontation problem with respect to Parker and Oelberg. Both Lab and Kenny were available for cross-examination. *Nelson v. O'Neil*, 402 U.S. 622, 626, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971); *United States v. Olander*, 584 F.2d 876, 886 (9th Cir. 1978).[20]

Ultimately, therefore, the issue is merely whether the District Court abused its wide discretion, *United States v. Martin*, 599 F.2d 880, 889 (9th Cir. 1979), in refusing to exercise its power under *Fed.R.Evid.* 403 to exclude evidence where the probative value is substantially outweighed by the danger of unfair prejudice.

The potential for prejudice appears to be more than minimal here, even though the Government had presented considerable evidence inculpating Parker and Oelberg. But Rule 403 sets a fairly stringent standard. In determining whether to exclude evidence under Rule 403, the District Court must look not merely for prejudice, but *unfair* prejudice, defined in the Advisory Committee's Note to Rule 403 as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Weinstein's Evidence ¶ 403[03] at 403–15 (1979) suggests that "[e]vidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action" may fall within this disfavored category of evidence. By contrast, the passing references to Parker and Oelberg in the recorded conversation do not even colorably approach the category.

To demonstrate an abuse of discretion, however, the appellants have the further burden of establishing that any danger of unfair prejudice *substantially* outweighed the probative value of the evidence. That burden has not been met here.

We thus find that the District Court did not abuse its discretion in admitting those portions of the telephone conversation that

LL: And they mentioned Dynapac.
JK: Yeah.
LL: And, uh—and so, you know, there was a tie-in there with—
JK: Yeah.
LL: —with Dynapac and George and Trent.
JK: Yeah.
LL: And I—my guess is that they're onto Trent, because they asked me, you know, what was my relationship with Trent—
JK: Yeah.

**20.** The Government suggests that the statements on the tape may well have been substan-

tively admissible against Parker and Oelberg, obviating the need either for cautionary instructions or our review of prejudicial effects. This proposition raises complex questions under the "in furtherance" requirements of the co-conspirator hearsay provisions in *Fed.R. Evid.* 801(d)(2)(E), however, which we need not reach to resolve the issues in this appeal. *Compare United States v. King*, 587 F.2d 956, 962 (9th Cir. 1978) *and United States v. Smith*, 623 F.2d 627, 630 (9th Cir. 1980) *with United States v. Fielding*, 645 F.2d 719, 725–726 (9th Cir. 1981) *and United States v. Eubanks*, 591 F.2d 513, 518–21 (9th Cir. 1979).

mentioned Parker and Oelberg. *United States v. Castillo*, 615 F.2d 878, 886 (9th Cir. 1980); *United States v. Sigal*, 572 F.2d 1320, 1323 (9th Cir. 1978).

### III. OELBERG'S MOTION FOR NEW TRIAL

▪ Five weeks after the judgment of his conviction, Oelberg filed a motion for new trial, under *Fed.R.Crim.P.* 33, on the grounds of newly discovered evidence. Following a hearing, the motion was denied. Oelberg has separately appealed this ruling in No. 79–1735.[21]

The newly discovered evidence relates to the charge that a 1974 purchase order authorized and approved by Oelberg was false, in that no "deliverable" had ever been produced. At trial, the government had presented various witnesses who testified that no deliverable could be located in the government's files, and that in any case the work required under the contract did not ring true. Oelberg maintained that the work had been performed, and that the deliverable must have been destroyed routinely along with other obsolete classified documents. The jury found Oelberg guilty on this count.

Oelberg has now obtained an affidavit from a former typist at OMC, on which he founded his motion. At the time of trial the typist had told both defense and prosecution counsel that she could not remember the content of the projects she had worked on at OMC in sufficient detail to recognize them now, and thus neither side called her to testify as to whether OMC had actually prepared the questioned deliverables. According to the affidavit, however, on further examination of a draft of a Navy manual involved, she could identify her handwritten notations of tab settings and the like, indicating that she must have typed at least some portion of the final copy. She also now recognized some flow

chart illustrations that accompanied the manual. Oelberg proposed to introduce her testimony at a retrial to rebut the charge that no deliverable had ever been produced, observing that he had been acquitted on an analogous count (Count 6) when a Navy official testified that he recalled reading the deliverable under that contract.

▪ The decision to grant or deny a motion for new trial based on newly discovered evidence falls within the sound discretion of the trial judge, *United States v. Krasny*, 607 F.2d 840, 845 (9th Cir. 1979), and a significant burden rests on the moving party to show an abuse of discretion, *United States v. Brashier*, 548 F.2d 1315, 1327 (9th Cir. 1976). Five criteria must all be satisfied in order for the movant to prevail: the evidence must be, in fact, newly discovered; the motion must allege facts from which the court can infer diligence on the part of the movant in attempting to secure the evidence; the evidence must be more than merely cumulative or impeaching; it must be material to the issues involved; and it must be such as, on a new trial, would probably produce an acquittal. *Brashier*, 548 F.2d at 1327 & cases cited.

The District Court found that Oelberg had not met his burden on at least three of the five requirements: the evidence was not newly discovered; diligence had not been shown; and the evidence would not probably produce an acquittal on retrial.

▪ On review, it appears that the first two issues presented fairly close questions for the judge to resolve. Oelberg argues that the evidence was new (and therefore newly discovered) because it did not exist until the moment the typist *recognized* her notations on the manual. He further presents a version of his actions with respect to obtaining the manual and interviewing the typist that would uphold a finding of due diligence. The Government disputed his version of the events, however,

---

**21.** This Circuit follows the rule that a separate appeal should be brought where, after a judgment of conviction, a motion for new trial on grounds of newly discovered evidence has been denied. The latter appeal will normally be consolidated with a direct appeal of the conviction. *United States v. Hays*, 454 F.2d 274, 275 (9th Cir. 1972); *Balestreri v. United States*, 224 F.2d 915, 916 (9th Cir. 1955).

particularly with respect to the timing of his examination of the document and interview with the witness. Resolution of these conflicting factual contentions was part of the District Court's duty in ruling on the motion, and reviewable only for abuse of discretion. No such abuse appears here.

 Even if the District Court was in error as to the first two factors, however, the denial can readily be sustained in light of the third: probability of acquittal. The District Court found that the evidence would be subject to substantial impeachment, and lacked sufficient probative force to acquit. Further, and more significant, it found that the jury verdict against Oelberg was essentially resolved upon his own credibility as a witness; it noted that Oelberg was not a credible witness on material questions, that the jury did not believe him, and that the court shared that disbelief.

The record abundantly supports the court's observation. Oelberg's testimony appears to us evasive, contentious, and generally implausible. He displayed those qualities even on direct examination by his own attorney. Certainly the court is entitled to weigh the defendant's own performance on the stand in ruling on whether additional evidence would probably produce an acquittal.[22]

It is apparent to us that Oelberg did not meet his burden under *Brashier.* Thus the District Court's ruling was not an abuse of discretion.

## IV. SEVERANCE OF TAX EVASION COUNTS.

 The appellants have argued that the income tax evasion counts against Ken-

ny should have been severed, asserting various claims of prejudice and, in Kenny's case, lack of preparation. We find none of these arguments persuasive.

The income tax evasion counts were eligible for joinder in this indictment under Fed.R.Crim.P. 8(b), on the basis that the defendants were "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." This court, in addressing and upholding joinder of tax charges similar to those here in a conspiracy case similar to this one, observed that "[i]t is implicit in the language of Rule 8(b) that so long as all defendants participate in a series of acts constituting an offense or offenses, the offenses and defendants may be joined even though not all defendants participated in every act constituting each joined offense. Rule 8(b)'s 'goal of maximum trial convenience consistent with minimum prejudice' is best served by permitting initial joinder of charges against multiple defendants whenever the common activity constitutes a substantial portion of the proof of the joined charges." *United States v. Roselli,* 432 F.2d 879, 899 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971) (footnotes omitted). We feel that the tax evasion charges here fit the category, inasmuch as they arose directly and solely out of unreported income flowing from the illicit contracting activities. Proof of those activities indeed constituted "a substantial portion of the proof of the joined [tax evasion] charges." *Id.* In light of "our stated policy that Rule 8(b) should be construed broadly in favor of initial joinder," *United States v. Ford,* 632 F.2d 1354, 1373 (9th Cir. 1980), the District Court was not required, as a

---

**22.** This consideration answers one of appellant Oelberg's arguments on this score, in which he rails against the trial court's "bias":

> Judge Enright clearly shows his bias against defendant by stating his belief that Mr. OELBERG was not a credible witness. Mr. OELBERG's credibility, or lack thereof, is used by Judge Enright in his finding that a third party's supporting testimony probably

would not produce an acquittal. It appears that if God himself verified Mr. OELBERG that Judge Enright would not believe defendant.

As the discussion above shows, however, Oelberg's credibility is entirely germane in gauging whether retrial with the new evidence would probably produce an acquittal, inasmuch

matter of law, to sever the tax counts.[23] *United States v. Satterfield*, 548 F.2d 1341, 1344 (9th Cir. 1977), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978); *United States v. Friedman*, 445 F.2d 1076, 1082 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971).

The appellants seem to argue further, however, that the District Court should have exercised its discretion to sever the tax counts in accordance with *Fed.R. Crim.P.* 14, and that failure to do so was an abuse of discretion. Kenny argues that he was prejudiced in having to defend tax counts simultaneously with the other counts, and had inadequate time to prepare a defense. The other appellants argue that evidence prejudicial to them was admitted because of the tax counts.

Rule 14 provides that if it appears that prejudice will result from a joint trial, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires. This determination is a matter within the District Court's discretion, and the proper standard of review is abuse of discretion. *United States v. Brashier*, 548 F.2d 1315, 1323 (9th Cir. 1976); *United States v. Campanale*, 518 F.2d 352, 359 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976). The test is whether joinder is so manifestly prejudicial that it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion to sever. *Brashier, supra*, 548 F.2d at 1323; *Campanale, supra*, 518 F.2d at 359. The burden is on defendants to make a strong showing of prejudice in order to obtain relief under the Rule. *Williamson v. United States*, 310 F.2d 192, 197 (9th Cir. 1962).

As we observed above, the tax counts in this case arose directly out of the substantive counts. In other words, the Government argued that the money fraudulently

obtained by Kenny constituted the unreported income in the tax counts. The evidence used to establish fraudulent contracting essentially established the tax violations; the Government needed only to show that the income had not been reported.

Kenny makes much of the fact that an I.R.S. expert was put on the stand to testify "concerning numerous exhibits and summaries he had made from the exhibits." He seems to imply that without the tax counts, that testimony would not have been admissible. That position is clearly incorrect, however; much of this testimony related to the substantive counts of fraudulent contracting and bribery, and would have been admissible in any event. It appears from the record that it would have made little difference to Kenny's trial had the tax counts been severed.

For the same reason, it is hard to perceive any special prejudice to Parker and Oelberg due to the joinder of the tax counts; again, most of the evidence would have come in anyway. "Some prejudice necessarily inheres when defendants are joined for trial. However, '[i]f all that was necessary to avoid a joint trial were a showing of prejudice, there would be few, if any, multiple defendant trials.'" *United States v. McDonald*, 576 F.2d 1350, 1355 (9th Cir. 1978), *quoting* 8 Moore's Federal Practice ¶ 14.-04[1], at 14–14.1 (1977). The District Court did rule that some of the evidence, including some at issue here, was admissible only against Kenny, but, as noted earlier, the defendants elected to forego a cautionary instruction to that effect. Under the circumstances, we feel that the appellants have failed to demonstrate prejudice rising to the level that would compel severance under Rule 14.

Finally, the argument of Kenny's counsel that he was misled into lack of preparation for defense of the tax counts borders on the frivolous. The record makes clear that the

as Oelberg would almost surely have to testify again at such a retrial.

**23.** We can see no distinction, for joinder purposes, between the charge involved in *Roselli*, filing a false tax return (26 U.S.C. § 7206), and

the charge of tax evasion involved here (26 U.S.C. § 7201), despite the appellants' assertion that "a crucial difference" exists. What that crucial difference might be the appellants do not say.

District Court went to great lengths to accommodate this concern.[24] It further indicates that despite requests by the District Court for Kenny's counsel to set forth the nature of the defense and reasons why preparation would require more time, this was never done. Indeed, we lack any such explanation in *this* court.

The indictment clearly indicated that tax offenses would be proved in the Government's case. The trial date was set some three months in advance and almost five months from indictment, with "open discovery" of the Government's case on the tax counts available three months before trial. In our view, if Kenny's counsel was unprepared to defend the tax counts under those circumstances, it was a situation of his own making.

The District Court did not abuse its discretion in denying the motion to sever the tax counts.

## V. SUFFICIENCY OF THE EVIDENCE AGAINST OELBERG

 Oelberg argues that the evidence was insufficient to convict him on any of three counts on which guilty verdicts were returned against him. We find no merit in the contention.

Our inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61

L.Ed.2d 560 (1979) (emphasis in original); *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980); *United States v. Bailey*, 607 F.2d 237, 242 (9th Cir. 1979).

We have already observed that the evidence was sufficient to support the jury's verdict on the conspiracy count. We are similarly satisfied that Oelberg's convictions for presenting a false claim and receiving an illegal gratuity are founded on sufficient evidence. His arguments on appeal amount largely to assertions about the weight and credibility of the evidence presented by the Government, but it is the jury's role, not ours, to assess credibility of witnesses and resolve conflicts in the evidence. We think that the evidence, reflected in the statement of facts at the beginning of this opinion, supports a finding by a rational trier of fact that the elements of the charged offenses had been proved beyond a reasonable doubt.

Significantly, the jury in this case had the opportunity to consider not only the evidence presented in the prosecution's case, but the testimony of the defendants themselves. Oelberg testified in detail, and was cross-examined in detail, regarding the OMC–NELC contracts and the SCS/Gray Gryphon activities. When the defendant elects to testify, he runs the risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth. *See, e. g., United States v. Martinez*, 514 F.2d 334, 341 (9th Cir. 1975); *United States v. Chase*, 503 F.2d 571, 573 (9th Cir. 1974). Coupled with the independent evidence presented, Oelberg's testimony forms an adequate basis for the jury's verdicts.[25]

---

**24.** At the pretrial hearing at which the motion to sever was considered, the District Court noted the following factors in denying that motion: the Government agreed to produce the entire report of the IRS special agent to assist Kenny's counsel in preparing the defense; the Government agreed not to present any specific tax evidence (summary witness testimony) until the conclusion of its case in chief; the court would allow Kenny to recall any Government witnesses for further cross-examination relating to the tax counts; and the anticipated trial schedule called for a two-week break which would allow for further preparation by Kenny's counsel.

**25.** We note in passing the applicability of this Circuit's "concurrent sentence doctrine ... under which a federal appellate court, as a matter of discretion, may decide that it is unnecessary to consider arguments advanced by an appellant with regard to his conviction under one count of an indictment if he was validly convicted under another count and concurrent sentences were imposed," *United States v. Walls*, 577 F.2d 690, 699 (9th Cir. 1978), to Oelberg's situation. We are satisfied that the evidence is sufficient as to each count on which Oelberg was convicted, but had we doubts as to any one count we would incline toward invoking the concurrent sentence doctrine as to it.

## VI. OTHER ARGUMENTS

*Challenges to the Indictment.* Both Kenny and Oelberg have attacked the indictment underlying this prosecution. Kenny argues that the indictment should have been dismissed by the District Court because the "grand jury did not receive any instructions as to the applicable law in this case." Oelberg argues that the indictment should have been dismissed because the Government deliberately destroyed exculpatory evidence. We find neither argument persuasive.

▪▪▪ Kenny suggests that "in a case such as this no Federal Grand Juror could knowlingly [*sic*] return an indictment against the Appellant Kenny without *some* instruction as to the applicable law." This novel argument, based loosely on the fifth and sixth amendments, seeks to introduce into grand jury proceedings an analogue to petit jury instructions given at the end of trial. Kenny has not elaborated on what he means by "applicable law," however, nor does he seem to argue that the evidence before the grand jury was insufficient to support the allegations in the indictment.

We find no authority, and Kenny has cited none, that would support this argument. To the contrary, as the Supreme Court has stated, "[a]n indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on its merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956); *see United States v. Kennedy*, 564 F.2d 1329, 1338 (9th Cir. 1977), *cert. denied sub nom. Myers v. United States*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). That indictment is normally prepared by the prosecutor, who is presumably acquainted with the "applicable law." *See United States v. Chanen*, 549 F.2d 1306, 1312 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977). We are not persuaded that the Constitution imposes the additional requirement that grand jurors receive legal instructions.

Furthermore, the giving of such instructions portends protracted review of their adequacy and correctness by the trial court during motions to dismiss, not to mention later appellate review. This is not an auspicious case from which to launch courts on the journey through such a toilsome mire, and we decline to do so. It was not error for the District Court to deny Kenny's motion.

▪▪▪ Oelberg, on the other hand, argues that his indictment should have been dismissed on the ground that the Government had destroyed certain records that might have been exculpatory. The prosecution's case against Oelberg included allegations that no "deliverable" was ever produced under certain of the fraudulent contracts. Oelberg claims that when he retired from NELC in 1975, he left records and OMC deliverables in a secure area of NELC, and that these records and deliverables were intentionally destroyed by government agents at a time when Oelberg was a known target of the investigation.

The record contradicts Oelberg's contentions, showing that (1) any destruction of Oelberg's records was part of the normal housekeeping functions of NELC (a policy of destroying obsolete classified materials), (2) such destruction was unrelated to and prior to the *commencement* of the criminal investigation (long before Oelberg became a target), and (3) since no record was made of what was destroyed, no one could be sure that any exculpatory materials were included among the destroyed records. There is ample support for the District Court's denial of Oelberg's motion.

*Trial Moderation.* Out of the 46-volume trial record, appellants Kenny and Oelberg have pointed to a handful of instances where the District Court allegedly made incorrect rulings on evidence. Specifically, Kenny complains of instances of the court's allowing witnesses to qualify answers on cross-examination, limiting the pursuit of certain inquiries in cross-examination, and overruling "valid hearsay objections." Oelberg complains of a brief episode where the court restricted the answers of his character witness to "good" or "bad".

■ These arguments have no merit. Our review of the record indicates that the District Court treated both sides evenhandedly during the trial, and was generous in allowing each attorney to proceed as he wished. In each area complained of, the standard of review is abuse of discretion. *See Rogers v. United States*, 609 F.2d 1315, 1318 (9th Cir. 1979); *United States v. Weiner*, 578 F.2d 757, 766 (9th Cir. 1978), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1979); *United States v. Trapnell*, 512 F.2d 10, 12 (9th Cir. 1975). To the extent there may even have been any error in the District Court's rulings, the record reflects no abuse of discretion.

■ Similarly, we find no error in the District Court's refusal, despite the urging of defense counsel, to recall the prosecutor's first witness as the court's own witness. Defense counsel were offered the opportunity to recall the witness themselves, which they declined. The misstatement at issue—when the witness had first reported OMC irregularities to the authorities—was inconsequential.

The calling of witnesses by the court is a matter of discretion, *Estrella-Ortega v. United States*, 423 F.2d 509, 510 (9th Cir. 1970), and the appellants have failed to show even a colorable abuse of that discretion, nor any resulting prejudice to them. The contention that the District Court committed "plain error" here is frivolous.

■ *Sentencing.* Finally, the appellants argue that it was error for the District Court to receive and consider a letter from the Acting Secretary of the Navy at the time of sentencing.[26] As a general rule, the District Court may consider a wide range of information in determining a defendant's sentence. 18 U.S.C. § 3577; *United States v. Martinez-Navarro*, 604 F.2d 1184, 1186 (9th Cir. 1979). Appellants do not intimate that the letter contained false or misleading information, nor that the information in the letter was demonstrably made the basis for the sentence. *See United States v. Lasky*, 592 F.2d 560, 562 (9th Cir. 1979); *Farrow v. United states*, 580 F.2d 1339, 1359 (9th Cir. 1978) (en banc).

On the other hand, we must consider whether the receipt of this letter violates the rule recently set forth in *United States v. Wolfson*, 634 F.2d 1217, 1221 (9th Cir. 1980), wherein we held "that it is improper for the prosecution to make, or for the court to receive from the prosecution, an ex parte communication bearing on the sentence." Noting the significance of sentencing proceedings to defendants in criminal cases, we observed that "it is of the utmost importance not only that justice be done but that it appear to be done. A secret communication by the prosecutor, an adversary advocate, to the judge, especially when it is invited by the judge and contains not only factual statements but also a recommendation of what the sentence should be, destroys that appearance. We cannot approve it." *Id.* The sentence in *Wolfson* was vacated and the cause remanded for resentencing.

On reviewing the instant case in light of the considerations enumerated in *Wolfson*, we feel that the resentencing remedy would be entirely inappropriate here. The letter came not from the prosecutor but from an outsider, and there is no suggestion that it was invited by the judge. The existence of the letter, and the relevant language in it, was disclosed to the defendants at the sentencing hearing, evoking no response or objection from defense counsel. The letter contained no factual allegations nor any actual sentence recommendations, but

---

**26.** During the prosecutor's sentencing remarks, he made reference to a letter directed to the court from the Acting Secretary of the Navy:

"I think the court has received a letter from the Department of the Navy itself, from the Acting Secretary of the Navy, and I just briefly would like to read what I think is significant in the last paragraph of Mr. Woolsey's letter in which he says: 'It is essential to the Navy, indeed to all the nation's citizens, that other men and women who have the power to sacrifice the public trust for private gain know not just that yielding to such temptation is wrong, but also that it will be discovered and punished.'"

R.T. 8045.

merely "hortatory" language. There is no indication that the judge relied on the letter in sentencing, and indeed the record shows that the District Court had ample, independent grounds, which it fully detailed, for imposing the sentences it did.

We do not wish these remarks to be misconstrued as a ringing endorsement of the procedure followed by the prosecutor in this case, however. We can see no reason why this letter was not disclosed to the defendants. While we do not believe a remand for resentencing is called for in this case, we feel that the better practice in future cases would be for the prosecutor to disclose this kind of material to the defense where possible.

For the foregoing reasons, the convictions of Kenny, Oelberg, and Parker are hereby AFFIRMED.